STATE

v.

**Steven R. SALVATORE.**

**No. 98–175–C.A.**

Supreme Court of Rhode Island.

Jan. 4, 2001.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Thomas F. Connors, Edward J. Romano; William C. Dimitri, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Court for oral argument on November 9, 2000, on the appeal of Steven R. Salvatore (Salvatore or defendant) from judgments of conviction for bribery and filing a false document following a jury trial in the Providence County Superior Court. We affirm the judgment.

### Facts and Travel

Salvatore was charged on April 13, 1994, by an indictment charging a number of counts consisting of various acts of bribery, larceny, and racketeering, allegedly committed either individually or in concert with other individuals, in connection with his respective position in one or more Rhode Island financial institutions. He was tried before a jury in Providence County Superior Court and convicted of count 5, bribery in violation of G.L.1956 §§ 11–7–3 and 11–7–5, and count 9, filing a false document in violation of G.L.1956 § 11–18–1. He was acquitted of all other charges. The facts insofar as they are pertinent to this appeal are as follows.

In the late 1980s, defendant approached Ben Cerilli (Cerilli) about a joint banking venture. The two men, along with several other individuals whose interests they later purchased, formed the Jefferson Financial Group (the Group). The Group began exploring options for raising the million dollars necessary to capitalize a bank and insure its deposits and ultimately obtained a loan from Fleet National Bank (Fleet) that was used to purchase a $1,000,000 dollar interest-bearing certificate of deposit at Fleet. Two inspectors from the Department of Business Regulation (DBR) inspected the certificate and verified it to be "a deposit at Fleet in the amount of one million [dollars];" thus, apparently, satisfying the amount required to capitalize a state bank and obtain deposit insurance.

As the president of Jefferson Loan and Investment Bank (Jefferson Bank), defendant signed documents unconditionally guaranteeing the bank's repayment of the $1,000,000 promissory note to Fleet. At trial, defendant said that he had signed so many papers in Fleet's offices the day the loan closed that he had to rely on his attorneys for the contents of those documents and, as a result, he had not become aware of that guaranty until it was pointed out to him much later. However, on cross-examination, defendant admitted that not all these papers were signed that day and that, in fact, he had signed two of them nearly four weeks before the actual closing.

During Jefferson Bank's annual examination by DBR in 1989, the examiner found that an extremely high number of Jefferson Bank's loans lacked the required documentation. The examiners also found

that Jefferson Bank was making monthly payments to the Group for something called a "management fee," but they could not find any documented evidence of a contract to substantiate the payment of those fees. The Group was receiving approximately $10,000 a month, which the examiners were told was a fee for services performed by either the Group or its officers. The examiners later learned that this amount was exactly the same as a monthly interest obligation on the note payable by the Group to Fleet in the amount of $1,000,000. The note between the Group and Fleet listed Jefferson Bank as an unconditional guarantor of the indebtedness. This meant that Jefferson Bank had not been properly capitalized in accordance with the licensing regulation 98–14–5(a) of the DBR.[1]

Richard Sullivan (Sullivan), a certified public accountant, provided accounting and tax services for defendant, both individually and for his corporations, including Jefferson Bank. Sullivan testified at trial that he assisted Jefferson Bank with its accounting system and that he prepared financial reports and statements for the periods ending December 31, 1987, and December 31, 1988. He testified that although he became aware that Jefferson Bank, through defendant, had signed a guaranty of the obligation of the Group for the $1,000,000 loan from Fleet to the Group, his reports and statements did not reflect that obligation because, at the time he prepared them, he knew nothing about this scheme.

Sullivan testified that he relied upon the client to provide truthful information essential to such reports and that this obligation had been explained to defendant both in person and in two writings sent to him by Sullivan's accounting firm. One of these writings was an "engagement letter" that set forth the range of services to be provided for the particular engagement (in this case, audit and tax returns) and that directed defendant's attention to the fact that management had the responsibility for the proper recording of transactions in the records, for the safeguarding of assets, and for the substantial accuracy of the financial statements. That letter was dated January 20, 1988, and was signed by defendant as President of Jefferson Bank on January 29, 1988.

The second writing was a "letter of representation." The purpose of that letter was to document the discussion of the items enumerated therein and to obtain the client's representation that all information requested by the accountant had been provided and fully and accurately disclosed. The defendant signed a letter specifically representing that "[a]ll contingent assets and liabilities, including loans charged off and outstanding letters of credit[, had] been adequately disclosed to the auditor and in the financial statements[,] where deemed appropriate." Sullivan testified at trial that the bank's guaranty of the $1,000,000 note to Fleet was a contingent liability of the bank and that defendant had not disclosed it. These documents formed the basis for the charge of filing a false document.

The defendant's acquisition of equipment leases from Michael Lolicata's (Lolicata) company, FES, formed the basis of the bribery charge. James Wolfe (Wolfe), a former officer of People's Bank, testified under a grant of use immunity that in 1988 Lolicata told him that his business was growing very rapidly and that he was generating too many leases—so many, in fact, that he did not have enough money to fund them all. Wolfe, having been acquainted with defendant for several years and

1. Steven Cayouette, the chief bank examiner for the Department of Business Regulations of the State of Rhode Island, testified at trial that, when a bank begins operations, it is required to start with at least $1,000,000 in unencumbered free capital that it is not obli-gated to repay. By essentially having Jefferson Bank paying the indebtedness of the Group, it was repaying the capital that should have been unconditionally committed by the individuals or entity that founded the banking institution.

aware of his access to bank money, introduced Lolicata. The defendant and Lolicata reached an agreement involving the purchase of some of the leases. Wolfe testified to a conversation that he had with defendant in this regard, before the first purchase was consummated:

> "Well, we had been working on it and at one point [defendant] said, 'I would like to have a point for myself in this deal.' So, I went to Mike [Lolicata]. I said, 'He wants an extra point on this deal.' Mike said, 'Okay' and it was paid."

Wolfe testified that "a point" meant a 1 percent fee. The total purchase price for the leases amounted to approximately $200,000 and the amount tendered to defendant was $2,000 and paid in cash. Wolfe testified that Lolicata gave him an envelope containing cash and that he kept $500 and gave the rest of the money to Salvatore. Asked on cross-examination whether there was anything secret or sinister about this $2,000 payment to defendant, Wolfe responded: "Other than the fact that it was just private."

Salvatore was convicted of solicitation or acceptance of a bribe by an agent, employee, or public official,[2] for which he was sentenced to two years at the Adult Correctional Institutions (ACI), with one year to serve, one year suspended, with probation. The defendant was also convicted of giving a false document to an agent, employee, or public official,[3] for which he was sentenced to serve one year at the ACI, concurrent with his sentence on count 5. His motion for a new trial was heard and denied on July 14, 1997. The defendant timely appealed. On appeal, he argued that the trial justice erred in denying his motion for a new trial on each of the two counts on which he was convicted. Similarly, defendant argued that the trial justice erred in denying his motion for a judgment of acquittal on each of those two counts.

## I

### Motion for Judgment of Acquittal

The standard applied to a motion for judgment of acquittal requires less in the way of evidence than the standard applicable to a motion for a new trial. In considering a motion for judgment of acquittal, the trial justice may not consider either the weight of the evidence or the credibility of witnesses. *See State v. Caruolo*, 524 A.2d 575, 580–81 (R.I.1987). Rather, the trial justice "must determine whether the evidence offered by the state

---

2.  **General Laws 1956 § 11-7-3 provides:**

    "(a) No person in public or private employ, or public official shall corruptly accept, or obtain or agree to accept, or attempt to obtain from any person, for him or herself for any other person, any gift or valuable consideration as an inducement or reward for doing or forbearing to do, or for having done or forborne to do, any act in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official, or for showing or forbearing to show favor or disfavor to any person in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official.

    "(b) It shall not be a defense to a prosecution under this section that the person did not have the power or authority to perform the act or omission for which the reward or inducement was offered, solicited, accepted, or agreed upon."

3.  **General Laws 1956 § 11-18-1 provides:**

    "No person shall knowingly give to any agent, employee, servant in public or private employ, or public official any receipt, account, or other document in respect of which the principal, master, or employer, or state, city, or town of which he or she is an official is interested, which contains any statement which is false or erroneous, or defective in any important particular, and which, to his or her knowledge, is intended to mislead the principal, master, employer, or state, city, or town of which he or she is an official. Any person who violates any of the provisions of this section shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be imprisoned, with or without hard labor, for a term not exceeding one year, or be fined not exceeding one thousand dollars ($1,000)."

is capable of generating proof of guilt beyond a reasonable doubt." *State v. Tempest,* 651 A.2d 1198, 1216 (R.I.1995) (quoting *Caruolo,* 524 A.2d at 580–81). In making this determination, "the trial justice 'must view the evidence in the light most favorable to the state * * * and must draw therefrom all reasonable inferences consistent with guilt.'" *Id.* at 1216–17 (quoting *Caruolo,* 524 A.2d at 581). If, by that standard, the trial justice finds the evidence enough as a matter of law to support the charge, he must deny the motion and send the case to the jury. *Tempest,* 651 A.2d at 1218.

■ With regard to the bribery charge, the trial justice found that the testimony of Wolfe that defendant requested "a point" for himself and that Wolfe delivered an envelope containing cash was sufficient in and of itself to allow a jury to find defendant guilty beyond a reasonable doubt of the bribery charge. Significantly, the trial justice appropriately concluded that the question of whether the $2,000 cash payment to Salvatore was a bribe solicited and accepted by defendant for his part in accomplishing the transaction, or merely a small brokerage fee to make the transaction go through as the defendant argued, could be resolved only by assessing the weight and credibility of the two witnesses with personal knowledge of what had transpired. However, assessing the weight of the evidence and credibility of the witnesses are matters expressly forbidden to the trial justice in deciding a motion for judgment of acquittal. *See State v. Henshaw,* 557 A.2d 1204, 1206–07 (R.I.1989) (viewed "in the light most favorable to the state," defendant's explanation and denial of intent to defraud could be completely disregarded by the jury, therefore, "trial justice correctly determined that the evidence presented was capable of generating proof of guilt beyond a reasonable doubt").

■ With regard to the charge of filing a false document, the trial justice noted that § 11–18–1 prohibits anyone from knowingly giving to agents of public or private entities a document that contains a materially false or erroneous statement, and which the person knows is intended to mislead the public or private entity to which it is transmitted in a material manner. *State v. Smith,* 662 A.2d 1171, 1177 (R.I.1995). The purpose of the statute is to protect the public and private entities named in the statute from fraud and deceit and the "perversion which might result from the deceptive practices described." *United States v. Woodward,* 469 U.S. 105, 109, 105 S.Ct. 611, 613, 83 L.Ed.2d 518, 522 (1985) (per curiam) (quoting *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598, 604 (1941) (construing analogous federal statute, 18 U.S.C. § 1001)). The trial justice found that the testimony of Sullivan and the document signed by defendant, taken in the light most favorable to the state, was sufficient to prove the elements of fraud proscribed by § .11–18–1: that defendant knowingly gave an employee in private employ (Sullivan) a document in respect of which both Sullivan's accounting firm and the depositors of the bank that retained the firm's services were interested, which, to defendant's knowledge, was false, erroneous, and defective in an important particular, and was, to his knowledge, intended to mislead the accounting firm and the bank's regulators. This finding was not erroneous. The trial justice applied the proper standard and found that there was sufficient evidence to allow a jury to find the defendant guilty beyond a reasonable doubt of the charge of filing a false document.

Thus, the trial justice properly denied defendant's motion for judgment of acquittal on both charges.

## II

### Motion for a New Trial

■ "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the

weight of the evidence." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994) (citing *State v. Marini,* 638 A.2d 507, 515 (R.I.1994)). "Specifically, the trial justice has at least three analyses to perform when ruling on a motion for a new trial." *Id.* (citing *State v. Bertram,* 591 A.2d 14, 29 (R.I.1991)). First, "the trial justice must consider the evidence in light of the charge to the jury, a charge that is presumably correct and fair to the defendant." *Id.* (citing *State v. Girouard,* 561 A.2d 882, 890–91 (R.I.1989)). Next, the trial justice should form his or her own opinion of the evidence. *Id.* In doing so, "[t]he trial justice must * * * weigh the credibility of the witnesses and [the] other evidence and choose which conflicting testimony and evidence to accept and which to reject." *Id.* (citing *Girouard,* 561 A.2d at 891). Finally, "the trial justice must determine by an individual assessment of the evidence and in light of the charge to the jury, whether the justice would have reached a different result from that of the jury." *Id.*

■ "In cases in which the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight." *Banach,* 648 A.2d at 1367. The trial justice's judgment will be disturbed only "if the trial justice has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *Id.* (citing *State v. Robbio,* 526 A.2d 509, 513 (R.I.1987)). Accordingly, "[t]he record should reflect a few sentences of the justice's reasoning on each point." *Id.* (citing *Girouard,* 561 A.2d at 890). However, he or she "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Id.* (citing *State v. Barnes,* 122 R.I. 451, 458, 409 A.2d 988, 992 (1979)).

After a careful review of the record before us, we conclude that the trial justice performed a complete and proper analysis with regard to both counts on which defendant was convicted. In denying defendant's motion for a new trial, the trial justice stated,

"I considered the evidence presented by the defendant[ ] in—on each of these matters, and I've concluded that it does not alter the weight of the evidence which I found to be substantial[,] presented by the State in support—to support its case * * *. On the whole, I do conclude that had I heard this case without the intervention of a jury, I would have reached the same conclusion with reference to these counts with regard to * * * [defendant] that the jury reached. I'm satisfied that it did indeed do justice between [this defendant] and the State of Rhode Island."

Accordingly, we are satisfied that the trial justice performed all the analyses required of him in rejecting defendant's motion for a new trial.

■ Nevertheless, defendant challenged the trial justice's determination of the credibility of the witnesses and the sufficiency of the evidence and argued that the trial justice's findings were completely at odds with the evidence in the case.

■ "This [C]ourt has expressly held that it is the task of the trial justice to determine whether the evidence presented is sufficiently credible to warrant a new trial." *Banach,* 648 A.2d at 1368. "Once such a determination has been made, '[t]his [C]ourt will not disturb the decision of a trial justice * * * unless that decision was clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence.'" *Id.* (quoting *Fontaine v. State,* 602 A.2d 521, 525 (R.I.1992)).

■ With regard to both charges, defendant essentially argued that the trial justice should have believed his testimony, rather than the testimony of the state's witnesses: namely, that the $2,000 payment was a co-brokerage agreement, not a bribe, and that he did not knowingly intend to deceive or mislead the accountants. However, as this Court held in *Banach,*

"[s]uch an argument is appropriate in a trial court but not in this [C]ourt." *Banach*, 648 A.2d at 1368 (quoting *Doyle v. State*, 430 A.2d 416, 418 (R.I.1981)) (citing *State v. Chatell*, 121 R.I. 528, 531, 401 A.2d 436, 438 (1979)). "A trial justice is under no obligation to sift through a witness's testimony and discard only those portions that are patently unbelievable. Rather, the trial justice '[can] believe[ ] one set of facts and disbelieve[ ] the other,' and [make] 'sound credibility findings by assessing the facts and the totality of the circumstances before him.' " *Id.* (quoting *Fontaine*, 602 A.2d at 526). This is exactly what the trial justice did in this case.

With regard to the bribery charge, the trial justice found that "all of the reasonable inferences to be drawn from Mr. Wolfe's testimony [lead] * * * to the inescapable conclusion that the $2,000 paid to [defendant] by Mr. Lolicata through Wolfe was a bribe because Jefferson [Bank] [of which defendant was president] ultimately purchased approximately $40,000 of lease[s]." Furthermore, even though the trial justice found that the immunized Wolfe may not have been a forthcoming witness, the justice did believe that "what he did say * * * was the truth * * *. [T]he defendant told Mr. Wolfe that he wanted something off the books, would Lolicata and Lolicata said okay. [The defendant] got $2,000 in cash. The deal went through." Finally, the trial justice explained his belief that the deal was a *quid pro quo* and that the payment was the catalyst for it:

> "That was the choice [defendant] made that violated his fiduciary duty, the fiduciary duty that he owed to his directors, stockholders and depositors. The fact that he made or reported this on his income tax does not at all lead me to believe the source or the reason or the basis for the payment that was made. [The defendant's] testimony as to the cobroker's arrangement, is not enough evidence to avoid the conclusion that the $2,000 deal was a quid pro quo."

With regard to the charge of filing a false document, the trial justice also performed the appropriate analysis. He found that:

> "* * * the jury was satisfied that the defendant gave a false statement to Mr. Sullivan and it was false * * * in an important particular, and it was intended to mislead. Also, there's no question in the Court's mind that the defendant's failure to disclose the contingent liability of Jefferson [Bank] on a Fleet loan was indeed such a statement. The fact that the defendant had excellent lawyers for Jefferson [Bank], the fact that he had to sign many papers at the closing; that he and Mr. Cerilli had placed their own holdings [as securities] does not alter the fact that the assets to Jefferson [Bank] were pledged. This omission is most important and would be the subject of a footnote in the balance sheet * * * ."

Thus, the trial justice found that the jury's verdict responded to the evidence in light of the charge and, agreeing with the verdict, he added his own reasoning that the defendant had a particular motive for misleading his accountant—namely, because a revelation of the true state of the bank's liability "would, in all probability, have brought prompt and serious consequences for Jefferson [Bank]."

Accordingly, defendant has failed to demonstrate that the trial justice was clearly wrong in his assessment and, consequently, we affirm the trial justice's denial of defendant's motion for a new trial.

Finally, defendant has argued that the state failed to establish beyond a reasonable doubt that the first Lolicata lease was purchased by Jefferson Bank and not as a result of the defendant acting on behalf of his other business entities. We deem this argument to be without merit. The evidence in this case demonstrated that the equipment leases for which the defendant accepted a cash payment were transferred almost immediately to Jefferson Bank, notwithstanding the possibility, as defendant

suggests, that there was an intermediate purchaser.

## Conclusion

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case are remanded to the Superior Court.

Justice FLANDERS did not participate.