**STATE**

v.

**James GRANT.**

**No. 2001–45–C.A.**

Supreme Court of Rhode Island.

Jan. 27, 2004.

Lauren Sandler Zurier, Esq., Providence, for Plaintiff.

Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

In this appeal, the defendant, James Grant (Grant or defendant), challenges his conviction on charges stemming from the armed robbery of a Providence convenience store. Discerning no error, we affirm the judgment of conviction.

### Facts and Travel

On February 9, 1999, at about 11 a.m., Lane's Discount Store (Lane's Discount or the store), a convenience store at 451 Hartford Avenue in Providence, was robbed for the first time in its fifty-three-year history. Four victims were in the store during the robbery: Pasquale Lanfredi (Lanfredi), the proprietor, Gloria Marovelli (Marovelli) and Joanne Pelosi (Pelosi), part-time employees, and Maritza Montes (Montes), a frequent customer. Each recounted the events of that morning.

Lanfredi testified that he had just returned to the counter area from the back of the store when three black men, each with a mask pulled down over his face, entered the store and rushed toward the counter area. The masks were made from a mesh material, possibly women's hosiery.

The three men vaulted the counter. The shortest assailant, whom Lanfredi estimated was five feet two inches or five feet three inches tall, was waving a gun and screaming "Mother [expletive], where is the money? Where is the safe, mother [expletive]?" Marovelli testified that the gunman stuck the gun in her back and she heard it go "click." She also testified that the gunman pointed the gun at Pelosi's neck. One of the taller men took Pelosi and Marovelli into the milk cooler at the back of the store and began to tie their hands with rope.

Lanfredi testified that as Pelosi and Marovelli were directed to the cooler, the gunman pushed him down and held the gun to his neck. Lanfredi described the gun as tan and "light-colored," similar in appearance to an antique or dueling pistol. Because the gunman always managed to stand to the side or behind him, Lanfredi was unable to see his face. The gunman then took Lanfredi to the front of the store and ordered him to lock the front doors. Lanfredi testified that he was so frightened and upset that he failed to secure the doors. The gunman then took Lanfredi back to the counter area, forced him to the floor, and began looting the drawers of cash, rolled coins, and unopened packets of lottery tickets.

While the gunman and Lanfredi were behind the counter, Montes, one of the store's frequent customers, entered the store through the partially locked front doors. She testified that she was immediately approached by a short black man wearing a red sweater, waiving a gun, and swearing at her. Montes said that she was able to see the gunman's face because his mask was rolled up on top of his head. The gunman then grabbed her by the arm, put the gun to her head, and took her to the cooler in the back of the store. The gunman told one of the taller assailants to

tie her up with the other women. Even while confined in the cooler, Montes said, that she was able to look back over her shoulder through the glass window and see the gunman's face a second time.

Lanfredi was eventually brought to the cooler and bound with wires from an intercom system the robbers had ripped off the wall. They also used the wires to rebind Marovelli, because one of the robbers had untied her hands when Montes arrived. At this point, the assailant noticed Marovelli's diamond ring and forcibly removed it from her finger.

After the robbers fled from the store, Pelosi and Marovelli went to the front of the store and discovered that their purses were missing. Among the items taken was a Louie Vuitton purse containing a matching wallet and Mickey Mouse pen that belonged to Pelosi. Marovelli tried to calm a "hysterical" Montes, but eventually called an ambulance because she appeared to be hyperventilating. The police were summoned, and they recovered two rolls of pennies outside the store, the rope and intercom wires used to tie the victims, and a .22–caliber bullet from behind the counter. They also lifted three fingerprints from the glass countertop, and subsequently identified them as belonging to Jarvis Grant, defendant's brother.

The state lottery commission and state police activated the stolen lottery tickets to track where they might be cashed. Later that evening, the police were notified that some of the stolen tickets had been cashed at several Providence liquor and convenience stores. The cashier at Downtown Variety described the person who cashed the tickets as a black man about five feet five inches tall, weighing about 140 pounds, and wearing a black oversized winter jacket and hat. A man matching this same general description also cashed stolen lottery tickets at Three Ring Liquors that

same evening. While at Three Ring Liquors, the man purchased a twelve-pack of imported Grolsch beer and a fifth of Remi Martin champagne. The man's likeness was captured on Three Ring Liquor's video surveillance camera.

The next day, Verna Caldwell (Caldwell), the mother of two of defendant's children, was arrested for cashing stolen lottery tickets. She possessed a Louie Vuitton pocketbook and a Mickey Mouse pen. Pelosi subsequently identified both the purse and the pen as her property. A consensual search of Caldwell's apartment produced an antique .22–caliber firearm, .22–caliber bullets, lottery tickets, two laundry bags, a bag holding some cash, two pieces of rope, and a twelve-pack of Grolsh beer with one bottle missing. The defendant's fingerprints were found on a stolen lottery ticket seized from the living-room table in Caldwell's apartment.

Lanfredi, Pelosi and Marovelli each identified the antique gun found in Caldwell's apartment as the firearm used during the robbery. The state's firearm's expert, Robert Hathaway, testified that the bullet found behind the counter at Lane's Discount had been chambered in that same antique gun.

Based upon defendant's attempt to cash stolen lottery tickets at Three Ring Liquors, his physical description was broadcast to police patrolling the Hartford Avenue and Laurel Hill Avenue area, resulting in his arrest on the evening of February 10, 1999. The next day, Montes picked defendant's photograph out of a photo array that police had assembled, identifying him as the gunman in the robbery. According to the police detective who showed Montes the array, she selected defendant's photograph "almost immediately."

Grant was charged with eight offenses stemming from the robbery of Lane's Dis-

count. He was tried before a jury in January 2000. He was convicted of five offenses, including first-degree robbery of Lanfredi and Marovelli, assault with a dangerous weapon of Pelosi, assault with a dangerous weapon of Montes, and possession of a firearm without a license. After the verdicts were announced, upon defendant's earlier agreement and the jury's finding of handgun possession, the trial justice also declared Grant guilty of possessing a firearm after having been previously convicted of a crime of violence.

The trial justice denied Grant's motion for a new trial on January 21, 2000. On March 7, 2000, Grant was sentenced to sixty years, with forty years to serve on the two robbery counts, twenty years to serve for assaulting Pelosi, ten years to serve for carrying a handgun without a license, ten years to serve for possessing a handgun after having been convicted of a violent felony, and twenty years for assaulting Montes with a dangerous weapon. All sentences were ordered to run concurrently, and this appeal followed.

## I

### Identification of Defendant

Grant alleges on appeal that the trial justice erred as a matter of law in allowing Montes to identify him as one of the robbers of Lane's Discount. The basis of that contention, which is raised for the first time on appeal, is that Montes lacked the personal knowledge required by Rule 602 of the Rhode Island Rules of Evidence to make that identification. According to Grant, Montes failed to see the robber's face unmasked and, therefore, was incapable of identifying him. In the alternative,

defendant argues that Montes was so traumatized by the events of that morning that she was incapable of identifying him.

"[A] witness's testimony is inadmissible under Rule 602 only if the trial justice finds that the witness could not have actually perceived or observed that to which he or she purports to testify." *State v. Addison*, 748 A.2d 814, 821 (R.I.2000) (quoting *State v. Gatone*, 698 A.2d 230, 236 (R.I.1997)). When a trial justice has made a determination concerning a witness's personal knowledge, we will not overturn that decision absent a clear abuse of discretion. *Id.; State v. Ranieri*, 586 A.2d 1094, 1098–99 (R.I.1991). We previously have stressed that "in situations where the personal knowledge is a close question or '[i]f it was unclear or uncertain how much opportunity a witness actually had to view an assailant, the issue would become one of credibility, an issue properly for the jury.'" *Addison*, 748 A.2d at 821 (quoting *State v. Vanover*, 721 A.2d 430, 436 (R.I. 1998)).

It is not the practice of this Court to review issues that are raised for the first time on appeal. According to our well settled "raise or waive rule," a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal.[1] *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994); *see State v. Mendez*, 788 A.2d 1145, 1147 (R.I.2002) (per curium). Furthermore, we have cautioned that a general objection does not suffice to preserve an issue for appellate review; rather, assignments of error must be alleged with sufficient particularity so it will call

---

1. We have recognized a narrow exception to the "raise or waive rule" when: (1) the error complained of is not harmless, (2) the record is sufficient to permit a determination of the issue, (3) the mistake is one of constitutional import, and (4) counsel's failure to raise the issue is attributable to a novel rule of law that counsel could not reasonably have known about during the trial. *State v. Rupert*, 649 A.2d 1013, 1016 (R.I.1994).

the trial justice's attention to the basis of the objection. *See Addison,* 748 A.2d at 820; *State v. Bettencourt,* 723 A.2d 1101, 1107–08 (R.I.1999).

Grant did not object to the introduction of Montes's identification on the basis of her purported lack of personal knowledge. Instead, before trial, Grant filed a boilerplate written motion objecting to "all out of court and all in court identification testimony of the defendant on the grounds that the admission of said identification would deny the defendant his rights under U.S. Constitutional Amendments IV, VI, XIV and Rhode Island Constitutional [*sic*] Article 1, Sections 6 and 10." Significantly, defense counsel waived argument on the motion, and instead responded to the trial justice's questions. Those questions focused on the issue of whether the photograph lineup the police prepared was unduly suggestive, *see, e.g., Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), not on whether the witness had personal knowledge of defendant's identifying characteristics. Accordingly, we hold that this issue was not properly preserved for appellate review.

We note, however, that even if defendant had objected to Montes's identification based on her alleged lack of personal knowledge, he would not have succeeded. After the trial justice concluded that the photographic identification was not unduly suggestive, he continued, *sua sponte,* to assess the reliability of her identification. "[T]his witness, Maritza Montes, was an extraordinarily powerful[] identification witness. There's no question in my mind—obviously not in hers—that this defendant was the one who held the gun to her head. * * * [T]his is a witness who indicated that she had occasional flashbacks and claims, 'All I see is that guy's face pointing a gun at my head.' I recognize that she did not spend a lot of time in face-to-face confrontation with this man. On the other hand, she made sure that she would remember his face when she was being tied up. She looked over her shoulder. She had to be sure she could get another look at him. She looked over. She saw him. He put his mask back on. There was good lighting in the store. Clearly, she wasn't very far away from him in the initial confrontation. The man held a gun to her head; so, no more than an arm's length could have been the distance between this defendant and this witness."

The trial justice did not abuse his discretion in finding that Montes had an adequate opportunity to see defendant's face. This is exactly what witnesses and trial justices are expected to do. There was no evidence contradicting her testimony that she had twice seen the assailant's face unmasked, once at close range. Montes's testimony that the lighting in the store was bright and that she viewed defendant from close range strongly supports her contention that she clearly saw defendant's face. *See, e.g., State v. Nhek,* 687 A.2d 81, 83 (R.I.1997) (finding personal knowledge under Rule 602 in which witness observed defendant under "decent lighting conditions" and at "relatively close distance"). The fact that the other witnesses did not see defendant without his mask does not disprove Montes's testimony that she had an adequate opportunity to see defendant's face.

The defendant's related argument, that Montes was so traumatized by the robbery that she was incapable of accurately perceiving the defendant, is not meritorious. Rule 602 is concerned with determining whether the witness had the *opportunity* to acquire the personal knowledge he or she is testifying to, not whether the witness's testimony is credible or accurate. *Nhek,* 687A.2d at 83; *Ranieri,* 586

A.2d at 1098. "The [trial] justice is not making a credibility determination and is not judging whether the witness is accurately and truthfully relating that which he perceived." *Ranieri*, 586 A.2d at 1098. Issues of credibility are questions of fact, and the trial justice appropriately admitted Montes's identification testimony for the jury's consideration. *Id.*

## II

### Lesser–Included Offenses

In a rather novel argument, defendant next challenges his two robbery convictions on the grounds that the trial justice erred by refusing to allow the jury to consider whether defendant might have been guilty of receiving stolen goods in violation of G.L.1956 §§ 11–41–2 and 11–41–5(a), and obtaining money by false pretences in violation of §§ 11–41–4 and 11–41–5. The state did not charge defendant with either of these crimes. Therefore, for defendant to succeed, he first must establish that these two misdemeanors are in fact lesser-included offenses of robbery. *See State v. Rodriquez*, 731 A.2d 726, 729 (R.I.1999) (per curiam) ("The threshold question here is whether compounding a felony is indeed a lesser included offense of robbery."). Because we conclude that receiving stolen goods and obtaining money by false pretenses are not lesser-included offenses of robbery, we affirm the trial justice's refusal to instruct the jury on the elements of those two crimes.

A lesser-included offense is one that does not require proof of any additional element beyond those required by the greater offense. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *State v. Godette*, 751 A.2d 742, 747 (R.I.2000); *Rodriquez*, 731 A.2d at 729–30. "Similarly, we have held that to determine [the] existence of a separate, as opposed to a lesser included offense: 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *Godette*, 751 A.2d at 747 (quoting *State v. Davis*, 120 R.I. 82, 86, 384 A.2d 1061, 1064 (1978)).

Because the statute establishing the penalties for robbery does not define the elements of the crime, G.L.1956 § 11–39–1, the common law definition remains applicable. *Rodriquez*, 731 A.2d at 729. Under the common law, robbery is defined as the "felonious and forcible taking from the person of another of goods or money [of] any value by violence or [by] putting [the victim] in fear." *State v. Briggs*, 787 A.2d 479, 487 (R.I.2001).

The elements of receiving stolen goods are provided in the statue that creates the offense, § 11–41–2. *See Rodriquez*, 731 A.2d at 729 (relying on statute to define elements of compounding a felony for purposes of applying *Blockburger* test). Section 11–41–2 provides in relevant part:

> "Every person who shall fraudulently receive any stolen money, goods, securities, chattels, or other property, knowing it to be stolen, shall be deemed guilty of larceny, although the person who stole the property may not have been prosecuted or convicted for it. The possession of any stolen property shall be evidence of guilty knowledge by the person having possession that the property was stolen, unless the person shows that it was acquired in the due course of trade and for adequate consideration."

Comparison of the elements of robbery and receiving stolen property reveals that they are separate offenses because each requires proof of at least one

fact that the other does not. For instance, first-degree robbery requires a felonious taking, by force, with the use of a dangerous weapon; receiving stolen goods requires none of these facts to be proven. Likewise, receiving stolen goods requires proof of the fraudulent receipt of the goods; robbery does not. Indeed, we have previously held that as a matter of law, "the receiver of the stolen goods must be someone other than the thief." *State v. Silva*, 110 R.I. 290, 291, 292 A.2d 228, 230 (1972) (per curiam). This rule runs afoul of the basic premise of the lesser-included offense doctrine, that evidence introduced to establish the greater offense must also establish the lesser. *Godette*, 751 A.2d at 747. Since by definition proof of the robbery could never establish the elements required by § 11–39–1, the trial justice properly refused to instruct the jury on the elements of that misdemeanor.

 The second misdemeanor, obtaining money by false pretenses, § 11–41–4, also must be classified as a separate offense to the crime of robbery, and not a lesser-included offense. "[T]he elements of obtaining [money] by false pretenses under § 11–41–4 are that the accused: '(1) obtain [money] from another designedly, by any false pretense or pretenses; and (2) with the intent to cheat or defraud.'" *State v. Henshaw*, 557 A.2d 1204, 1207 (R.I.1989) (quoting *State v. Markarian*, 551 A.2d 1178, 1180 (R.I.1988)). Robbery in this case required proof that the taking was forcible and that a dangerous weapon was used. Obtaining money by false pretenses, in contrast, requires that the money be obtained designedly, by false pretense, and with the intent to cheat or defraud. Because robbery and obtaining money by false pretenses each require proof of at least one element that the other does not, they are separate offenses.

## III

### Police Inventory Search

 Grant's final contention concerns an allegedly improper inventory search of his backpack after he was arrested. Upon Grant's apprehension on February 10, 1999, the arresting officers seized all the items from his person, including his backpack. The arresting officer then searched the backpack, asserting that the search was a necessary safety precaution. Although the trial court ruled that the arrest was lawful, it left open the issue of whether certain items recovered from the backpack—in particular a bottle of champagne and a roll of nickels—were admissible as the valid product of an inventory search made after defendant arrived at the police station.

The admissibility of the contents of defendant's backpack was raised again during the trial. The prosecution presented the testimony of the Providence detention officer Corey Morris (Morris) concerning the inventory search that had occurred after defendant arrived at the Providence police station. Morris testified that the initial inventory search was conducted by another detention officer, who had not fully complied with standard police procedures and had not fully inventoried the contents of defendant's backpack. Morris also said that he realized the inventory mistake on the morning of February 12, 1999, while conducting a routine inventory search of defendant's backpack to prepare for defendant's appearance in court. Morris discovered a small bottle of Remi Martin champagne and a roll of nickels in defendant's backpack that were not listed on the inventory sheet prepared by the other officer. Realizing that a properly completed inventory had not taken place during the previous search, Morris said that he "picked up where [the officer] left off." Morris completed the inventory form

and brought the champagne and roll of nickels to the attention of the detectives.

Based on these facts, the trial justice concluded that the inventory search Morris conducted was done pursuant to standard police procedure and was a reasonable means of protecting the safety of the police and courthouse occupants. The trial court noted that there was no requirement that the inventory procedure be in writing, as long as the routine nature of the procedure is established. Furthermore, there was no showing that the second search was done in bad faith or conducted for investigatory purposes.

■■■ The Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution protect citizens from unreasonable searches or seizures. *State v. Ortiz,* 824 A.2d 473, 480 (R.I.2003). Although most police searches must be undertaken pursuant to a lawfully issued warrant, a warrant is not a requirement for all lawful searches. As the Supreme Court has recognized, "[t]he relevant test *is not the reasonableness of the opportunity to procure a warrant,* but the reasonableness of the seizure under all the circumstances." *South Dakota v. Opperman,* 428 U.S. 364, 373, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 509, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Black, J., concurring and dissenting)).

■■■■ Inventory searches are an exception to the search warrant requirement of the Fourth Amendment. *See Opperman,* 428 U.S. at 372, 96 S.Ct. 3092; *State v. Bonin,* 591 A.2d 38, 39 (R.I.1991) (per curiam). Inventory searches serve three purposes: (1) to protect the owner's property while it remains in police custody, (2) to protect the police against claims or disputes over lost or stolen property, and (3) to protect the police or others from poten-

tial danger. *State v. Beaucage,* 424 A.2d 642, 644 (R.I.1981) (citing *Opperman,* 428 U.S. at 369, 96 S.Ct. 3092); *see Whren v. United States,* 517 U.S. 806, 811 n. 1, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). To be valid, the inventory search must be conducted pursuant to *standardized criteria,* or as part of an *established routine;* it may not serve as a pretext for "a general rummaging in order to discover incriminating evidence." *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). This Court has recognized the legitimacy of inventory searches conducted on an arrestee's personal effects inside a motor vehicle, *State v. Halstead,* 414 A.2d 1138, 1149 (R.I.1980), as well as those searches extending beyond motor vehicles and encompassing one's personal property. *Beaucage,* 424 A.2d at 644.

The defendant contends that the failure of the detention officer to properly conduct the initial inventory search made evidence discovered during the subsequent inventory search inadmissible. We perceive no reason, constitutional or otherwise, why this should be the case. The fact that the first officer failed to conduct a comprehensive inventory search does not rise to constitutional dimension, and does not taint the subsequent inventory search. Morris testified, and the trial justice found, that he was following an established routine when he inventoried Grant and his belongings to prepare for his appearance in court. The defendant does not dispute this fact. Furthermore, Morris testified that the purpose of that search was to secure the prisoner and his property to ensure the safety of the courtroom occupants, which is one of the three grounds this Court has expressly recognized as justifying an inventory search. *See, e.g., State v. Louro,* 589 A.2d 1197, 1199 (R.I. 1991) (per curiam). Finally, despite the

defendant's veiled implication, the record discloses no evidence of improper motive or bad faith on the part of Morris, and the trial justice found that none existed. Accordingly, we conclude that the search was a permissible inventory search, not unreasonable under the Fourth Amendment, and affirm the trial justice's decision to admit the fruits of that search into evidence.

## Conclusion

For the foregoing reasons, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.