**STATE**

v.

**Ronald M. HARNOIS.**

No. 2001–221–C.A.

Supreme Court of Rhode Island.

June 28, 2004.

Christopher R. Bush, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

On November 3, 2000, the defendant, Ronald M. Harnois (Harnois), was convicted by a jury for the murders of Tammy Petrin (Petrin) and Jenner Villeda (Villeda) (counts 1 and 2), aiding and abetting the murders of Petrin and Villeda (counts 3 and 4) and conspiring with Steven Wilson to murder Petrin (count 5). Thereafter, the Superior Court trial justice granted Harnois's motion for judgment of acquittal on count 4. Harnois was sentenced to serve life imprisonment on each of the first three counts and a ten-year term of imprisonment on count 5. The sentence on count 2 was ordered to be served without parole. Each sentence was ordered to run consecutively to each of the others and consecutive to cumulative sentences that Harnois already was serving on convictions for attempted murder, possession of a bomb, fourth-degree arson and bigamy. Those convictions were upheld by this Court in *State v. Harnois,* 638 A.2d 532 (R.I.1994) (*Harnois I* ).

Harnois appeals his most recent convictions on several grounds. First, he asserts that the trial justice erred in denying his motion for judgment of acquittal on count 3 of the indictment, aiding and abetting Petrin's murder, because he cannot be convicted of being both a principal and an aider and abettor for the same offense, and because there was insufficient evidence to support that conviction. Next, Harnois

contends that the trial justice inadequately reviewed the evidence in denying his motion for a new trial. Finally, Harnois maintains that the statute permitting the imposition of a sentence of life imprisonment without parole applies only to people who actually commit murder and not to aiders and abettors, that such a sentence was unwarranted and that the trial justice erred in failing to state on the record his reasons for imposing the sentence of life without parole.

## Facts/Procedural History

This case has its genesis in defendant's attempted murder of his second wife, Joanne, when he attached a bomb to the underside of her car. The events leading up to and surrounding the murder attempt may be found in *Harnois I*. At the time, an investigation revealed that Petrin also was married to Harnois as his third wife and that she, too, had been involved in planning Joanne's murder. In return for Petrin's testimony against Harnois, the state agreed to drop its charge against her for conspiracy to commit murder. Believing that the state would be unable to convict him of the charges in *Harnois I* without Petrin's testimony, Harnois set about planning Petrin's murder through various intermediaries. He succeeded in bringing his plan to fruition in the early hours of July 30, 1991, when Steve Wilson (Wilson) shot and killed Petrin at Harnois's behest. The murder occurred at Petrin's place of employment at a Burger King in Woonsocket, Rhode Island. Wilson also shot and killed Villeda, a janitor who happened to be cleaning the establishment at the time. The events leading up to the shootings were as follows.

While he was at the Intake Center of the Adult Correctional Institutions (ACI) awaiting trial on the charge of attempted murder, Harnois tried to solicit a daughter from his first marriage, Celeste Harnois (Celeste), and her boyfriend, Brian Plante,

to kill Petrin. They refused. Harnois then approached fellow inmate William DiGregorio (DiGregorio) and informed him that he was seeking a murderer for hire. DiGregorio testified that Harnois, who had been unsuccessful in recruiting other intake-center inmates to kill Petrin, became excited when he learned that DiGregorio knew somebody "on Federal Hill" who might agree to carry out the crime for a price. They planned various details "almost everyday," and discussed the payment of a fee of $5,000. However, DiGregorio was released unexpectedly before they finalized the arrangements.

Undaunted by this setback, Harnois asked Celeste to act as a go-between, and he executed a financial power of attorney so that she could withdraw the necessary money from his bank account to pay DiGregorio for Petrin's murder. Although it is not clear exactly how much of the agreed-upon $5,000 fee Celeste gave DiGregorio, it appears that at least $2,500 exchanged hands before it became clear that he had no intention of being involved in either killing or arranging to kill Petrin.

Disappointed as he may have been with DiGregorio's double-cross, Harnois did not allow that to deter him from overseeing the execution of his plan to murder Petrin. Accordingly, he next approached another ACI inmate, Shawn Lipscomb (Lipscomb), and offered to pay him $2,500 and to give him a car and an apartment in return for killing Petrin. Harnois wrote to Celeste and asked her to promise to give Lipscomb "anything" in return for getting Harnois out of prison. Such efforts were to no avail, so Harnois then communicated his interest in having Petrin killed to fellow inmate Gary Maxie (Maxie). Maxie testified that Harnois brought up the subject during their second conversation and during every conversation that they had thereafter. At first Maxie expressed no

interest in being involved, but when he later heard through the prison grapevine of how DiGregorio had double-crossed Harnois, he decided to attempt a swindle of his own.

After he was released from the ACI, Maxie stayed in contact with Harnois and reported that he had driven by Petrin's house on a number of occasions. He made the excursions in a gray Dodge automobile, Rhode Island license plate No. HI–53. When Maxie's later attempt to get money from Harnois failed, he informed Harnois that he no longer was interested in killing Petrin.

Shortly thereafter, Harnois contacted Maxie and advised him that he had recruited an individual named "Richard" to kill Petrin and that he would need Maxie's help to carry out the crime. Maxie agreed to participate in return for compensation. At trial, Maxie identified "Richard" from a photograph shown to him of Steve Wilson. Wilson was the person who actually shot and killed Petrin and Villeda.[1]

Maxie and Wilson met a few times before the fateful morning of the shootings. He drove Wilson to Petrin's home several times. One of Petrin's neighbors, Nancy Walker, thought the vehicle looked suspicious and made note of the vehicle as a gray Dodge, license plate No. HI–53. On one occasion, she observed Wilson as he attempted to enter Petrin's third-floor apartment by way of the fire escape. She recognized him as a former fellow junior high school student. On another occasion, Wilson was identified by a Burger King employee when he made inquiries about Petrin at that establishment.

Maxie testified that in the early hours of July 30, 1991, he met Wilson and loaned him a blue Ford Escort. That same morning, two witnesses were in the immediate vicinity of the Burger King at approximately 5:30 a.m. One witness, Julie Dewing, said that as she was walking home that morning, she observed a small blue car operated by an unidentified male drive past her several times before it turned into an entrance near Burger King. She testified that the driver was not Wilson, whom she knew from their growing up together. The second witness, Anthony Switzer, testified that, as he was sitting on a bench next to Burger King, he observed a car pull into an adjacent parking lot and drop off Wilson. He knew Wilson from previous encounters. They conversed briefly before Wilson left the scene. Switzer testified that he later heard gunshots and, shortly thereafter, he noticed Wilson inside Burger King. Switzer did not wait around to find out what had just happened. At approximately 6 a.m., the manager of the Burger King discovered Petrin and Villeda lying inside the establishment on the floor. Both had been fatally shot.

After the killings, Harnois contacted Maxie and thanked him for his help. He also later informed Lipscomb that he had successfully achieved his goal of killing Petrin but that, unfortunately, an innocent man also had been killed in the process. Although Harnois believed that the murder of Petrin would prevent the state from successfully prosecuting him on the charges relating to his attempt to kill Joanne, he was sorely mistaken. A jury convicted him of attempted murder, possession of a bomb, fourth-degree arson and bigamy. He was sentenced to serve four concurrent terms of imprisonment, the longest of which was for twenty years. *See Harnois I.* Thereafter, he was tried, convicted and sentenced as a result of charges stemming from the Burger King murders. It is those convictions that he now appeals.

---

1. Steve Wilson died before he could be tried   for murdering Petrin and Villeda.

## Analysis

### 1. Aiding and Abetting

Harnois was charged with murdering Petrin and Villeda (counts 1 and 2), as well with aiding and abetting those same murders (counts 3 and 4). At the close of the state's case, Harnois moved for judgment of acquittal on counts 1 and 2 on the theory that a person cannot be an aider and abettor and a principal of the same crimes. The trial justice denied the motion of acquittal on count 1 and reserved ruling on the motion of acquittal on count 2. Apparently believing that Harnois also had moved for judgment of acquittal on counts 3 and 4, the trial justice denied the motion on count 3 and reserved ruling on count 4.

At the close of his defense, Harnois moved for judgment of acquittal only on count 4.[2] The trial justice responded by saying: "I will incorporate what I said yesterday and I will reserve on # 4. I'll reserve on # 4 and # 2." Harnois later was convicted on all four counts by the jury. The trial justice then entered a judgment of acquittal as to count 4.

█ Harnois contends on appeal that counts 1 through 4 should not have gone to the jury "because one cannot be convicted of being both a principal *and* an aider and abettor * * *." Harnois additionally maintains that G.L.1956 § 11-1-3, the aiding and abetting statute, requires that the state prove that he was at or near the scene when the murders were committed, and that because the state failed to do so, the trial justice should have granted his motion for judgment of acquittal.

The state maintains that these issues were not properly raised and that even if they were, Harnois was convicted as an accessory before the fact pursuant to § 11-1-3, the aiding and abetting statute.[3]

It is our opinion that defendant failed to preserve this issue for appeal. To begin with, although not specifically asserted, this contention sounds in double jeopardy and, under Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure, "the defense of double jeopardy can be raised only by a motion filed before trial and * * * a defendant's failure to so move constitutes a waiver of his or her right to do so (though the court, for cause shown, may grant relief from the waiver)." *State v. McGuy*, 841 A.2d 1109, 1115 (R.I.2003). The record reveals that Harnois failed to raise the defense of double jeopardy before trial and did not later seek relief from that failure through a requisite showing of cause.

█ Furthermore, "the denial of a motion for judgment of acquittal made at the close of the state's case is preserved for appeal only if the defense has rested its case * * * or renews the motion at the conclusion of the presentation of all the evidence." *State v. Andreozzi*, 798 A.2d 372, 374 (R.I.2002) (quoting *State v. Studley*, 671 A.2d 1230, 1231 (R.I.1996)). Harnois moved for a judgment of acquittal at the close of the state's case on counts 1 and 2 but not on counts 3 and 4. However, the trial justice, apparently considering that counts 1 and 3 and counts 2 and 4 were inextricably linked, ruled as if Harnois had moved for judgment of acquittal

---

2. Count 4 charged Harnois with aiding and abetting the murder of Villeda.

3. General Laws 1956 § 11-1-3 provides in pertinent part:

"Every person who shall aid, assist, abet, counsel, hire, command, or procure anoth-

er to commit any crime or offense, shall be proceeded against as principal *or* as an accessory before the fact, according to the nature of the offense committed * * *." (Emphasis added.)

on all four counts. Consequently, the trial justice denied the motions on counts 1 and 3 and reserved ruling on the motions on counts 2 and 4. At the close of all of the evidence, Harnois moved for judgment of acquittal only on count 4. Consistent with his previous ruling, the trial justice reserved his consideration of the motions of acquittal on both count 2 and count 4. He later granted the motion on count 4.

Accordingly, even if this issue had not been precluded for failure to raise it as a double jeopardy defense before trial, it also was waived because Harnois failed to move for judgment of acquittal on counts 1 and 3 after he rested his case. *See Andreozzi,* 798 A.2d at 374.

### 2. Motion for a New Trial

■ Harnois next asserts that the trial justice did not adequately review the evidence in denying his motion for a new trial and that had he done so, the trial justice would have been compelled to grant the motion because of alleged inconsistencies in some of the witness testimony. We disagree with these appellate contentions.

■ "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Nunes,* 788 A.2d 460, 464 (R.I.2002) (quoting *State .v. Salvatore,* 763 A.2d 985, 990–91 (R.I. 2001)). In doing so, the trial justice first:

" 'must consider the evidence in light of the charge to the jury, a charge that is presumably correct and fair to the defendant.' * * * Next, the trial justice should form his or her own opinion of the evidence. * * * In doing so, '[t]he trial justice must * * * weigh the credibility of the witnesses and [the] other evidence and choose which conflicting testimony and evidence to accept and which to reject.' * * * Finally, 'the trial justice must determine by an individu-

al assessment of the evidence and in light of the charge to the jury, whether the justice would have reached a different result from that of the jury.' " *Id.*

■ "The decision to deny a defendant's motion for a new trial will be given great weight in cases in which the trial justice has articulated a sufficient rationale for his or her decision." *Id.* (citing *State v. Barrett,* 768 A.2d 929, 946 (R.I.2001)). "This Court will not disturb the trial justice's decision unless the trial justice overlooked or misconceived material evidence relating to a critical issue or if the trial justice was otherwise clearly wrong." *Nunes,* 788 A.2d at 464–65. "The record should reflect a few sentences of the trial justice's reasoning on each point, although the trial justice need only cite evidence sufficient for this Court to determine whether the trial justice applied the appropriate standards." *Id.* at 465. "This [C]ourt has held that when the fact-finder expressly accepts the testimony of a witness, and that testimony conflicts with another witness's, the acceptance of the testimony of the one is implied rejection of the testimony of the other." *Fonseca v. Balzano,* 454 A.2d 700, 702 (R.I.1983).

In denying Harnois's motion for a new trial, the trial justice began by summarizing the testimony of several witnesses into a narrative form. Although he did not specifically name the witnesses who provided these details, by reciting the facts as he did, he impliedly rejected any testimony that may have conflicted with such a version of the events. He also said that he "was impressed by the witnesses even though they had records." Specifically, he "found Switzer to be a very compelling witness[,]" and found that the evidence overwhelmingly demonstrated that Harnois "did recruit and hire to murder Tammy." He concluded that "[i]f I was sitting without a jury I would have absolutely no

qualms to find the defendant guilty beyond a reasonable doubt."

After our exhaustive review of the record, we are satisfied that the trial justice adequately reviewed the evidence and articulated a sufficient rationale for denying the motion for a new trial. Furthermore, we are persuaded that the trial justice did not overlook or misconceive any material evidence, nor was he otherwise clearly wrong in choosing which conflicting testimony and evidence to accept and which to reject, and in concluding that the combined evidence supported a verdict of guilt beyond a reasonable doubt. Accordingly, the trial justice did not err in denying the motion for new trial.

### 3. Life Imprisonment without Parole

■ Harnois was sentenced to serve a term of life imprisonment without parole for murdering Villeda in the first degree. He maintains on appeal that G.L.1956 § 11–23–2, entitled "Penalties for Murder," permits the imposition of a sentence of life imprisonment without parole only to people who actually commit murder and not to those who are vicariously responsible for murder. He asserts that even if such a sentence were permissible, it was unwarranted in this case, and he maintains that the trial justice erred in failing to state his reasons on the record for imposing the sentence.

■ "It is not the practice of this Court to review issues that are raised for the first time on appeal." *State v. Grant*, 840 A.2d 541, 546 (R.I.2004). "According to our well settled 'raise or waive rule,' a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal." *Id.* Harnois did not chal-

lenge the applicability of § 11–23–2 to his sentence at the trial level. However, he now attempts to frame the issue as that of a lack of subject-matter jurisdiction. *See* Super.R.Civ.P. 12(b) & (h); *Bradford Associates v. Rhode Island Division of Purchases*, 772 A.2d 485, 488 (R.I.2001) (considering that subject-matter jurisdiction may not be waived, it can be raised at any time during the proceedings). Harnois cites to *State v. Carter*, 827 A.2d 636 (R.I. 2003) to support his subject-matter jurisdiction contention. We discern that this reliance was misplaced.

In *Carter*, the issue was whether a conviction for violating a no-contact order constituted a second domestic violence offense for purposes of transforming a third offense into a felony under G.L.1956 § 12–29–5. *Carter*, 827 A.2d at 640–42. Because this Court held that it did not, the Superior Court did not have jurisdiction over the third offense; consequently, original jurisdiction had been conferred in the District Court.

In this case, however, Harnois was charged and convicted of two counts of murder in the first degree, two counts of aiding and abetting murder and one count of conspiracy to commit murder. There is no question that the Superior Court clearly had original jurisdiction over these crimes under G.L.1956 § 8–2–15.[4] However, Harnois maintains that the Superior Court did not have jurisdiction to sentence him to serve life imprisonment without parole because, he asserts, the punishment provisions contained in § 11–23–2 apply only to persons who actually commit murder and not to those who are vicariously responsible for murder. We disagree.

4. General Laws 1956 § 8–2–15 provides in pertinent part:
  "The superior court shall have original jurisdiction of all crimes, offenses, and misde-

meanors, except as otherwise provided by law, and shall sentence all persons found guilty before it to the punishment prescribed by law."

Section 11–23–2 provides in pertinent part:

"Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: (1) committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed; * * * [or] (6) committed by a person who at the time of the murder was committed to confinement in the adult correctional institutions or the state reformatory for women upon conviction of a felony; * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

Harnois was sentenced to serve a term of life imprisonment without parole for murdering Jenner Villeda after the jury specifically found that Villeda had been murdered: (1) during the commission of another capital offense; namely, the murder of Tammy Petrin, and (2) by a person who was confined at the ACI at the time of the crime.

We have stated previously that:

"where several persons combine or conspire to commit an unlawful act * * * each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine. Each is responsible for everything done by one or all of his confederates, in the execution of the common design, as one of its probable and natural consequences, even though the act was not a part of the original design or plan, or was even forbidden by one or more of them." *State v. Oliveira,* 774 A.2d 893, 918 (R.I.2001) (quoting *State v. Miller,* 52 R.I. 440, 445–46, 161 A. 222, 225 (1932)).

Stated otherwise, coconspirators are "vicariously liable for the actions of another coconspirator if those actions were committed in furtherance of an *existing* conspiracy." *State v. Lassiter,* 836 A.2d 1096, 1106 (R.I.2003) (citing *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)); *Oliveira,* 774 A.2d at 919.

The record reveals that Harnois conspired to kill Petrin and that, during the commission of the crime, Villeda also was murdered. Although it was Wilson who pulled the trigger, Harnois, as coconspirator, is vicariously liable for Wilson's actions on that fateful day. Thus, upon his conviction for murdering Villeda, the jury properly considered the applicability of the factors delineated in § 11–23–2 and, upon so finding, it was within the trial justice's jurisdiction to sentence Harnois to serve a term of life imprisonment without parole for that crime.

Harnois next avers that when imposing a sentence of life imprisonment without the possibility of parole, a trial justice must articulate sufficient reasons for this Court to appropriately review the sentence. Harnois maintains that the trial justice did not comply with this statutory mandate. He additionally asserts that the sentence was excessive because he lacked a previous criminal history and that it was disproportionate to the one received by Maxie, whose ten-year sentence for his involvement in the crimes was suspended with probation. Consequently, Harnois asserts that the case should be remanded for resentencing.

General Laws 1956 § 12–19.2–4 provides in part that

"After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life

imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

In this case, the trial justice concluded that "When you said Mr. Harnois that you must be dumb I don't think that you're dumb but from the evidence I heard you're evil right to the core." He then imposed a term of life imprisonment without parole for murdering Villeda.

"Because this case involves the imposition of a sentence of life without the possibility of parole, it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *State v. Bustamante,* 756 A.2d 758, 767 (R.I.2000) (quoting *State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000)). "To make such a determination, this Court shall examine the record, the findings of the trial justice, and the personal character, record, and propensities of the defendant." *Id.* at 767–68.

Although we have recognized that a trial justice is not obligated to engage in a long oration about his rationale for imposing a sentence, *see id.,* we conclude that in this case, the trial justice's reasons for imposing the life without parole sentence did not satisfy the requirements of § 12–19.2–4. Consequently, we will exercise our own independent judgment and discretion in determining whether the sentence was appropriate and just.

We discern from the record that, while the reasons given by the trial justice for imposing the sentence may have been accurate, albeit grossly inadequate, there was ample evidence to support the imposition of a sentence of life imprisonment without parole. The record reveals that Harnois was still married to Joanne when he entered into a bigamous relationship with Petrin. He then attempted to avoid the cost of a divorce from Joanne by attaching a bomb to her car. The bomb later detonated while she was driving the car but, lucky for her, Joanne survived the murder attempt. Petrin, also involved in the attempted murder, later agreed to testify against Harnois in return for leniency from the state.

While awaiting trial on charges of attempted murder, Harnois coldly and callously plotted Petrin's murder from his jail cell. He did so under the misguided impression that without Petrin's testimony he would be able to avoid being convicted for attempting to kill Joanne. Accordingly, Harnois set about soliciting someone, anyone, to carry out his plan. His repeated entreaties and promises eventually fell upon the receptive ears of Wilson and Maxie. However, during the course of the premeditated murder of Petrin, Wilson also shot and killed Villeda, an innocent bystander who just happened to be in the wrong place at the wrong time. It is for this second murder that Harnois received the sentence for life imprisonment without parole.

It is clear from the record that Harnois was the mastermind and prime mover in this malicious crime and that Harnois's sentence was not disproportionate to that received by Maxie. *See State v. Pacheco,* 763 A.2d 971, 983 (R.I.2001) and *State v. Ballard,* 699 A.2d 14, 17 (R.I.1997). Furthermore, although we deem the trial justice's rationale for imposing the contested sentence to be insufficient, we agree with the trial justice's conclusion that Harnois is "evil right to the core." His persistent, deliberate planning and facilitation of Petrin's murder to cover up his attempted murder of Joanne, as well as the heartless murder of Villeda, demonstrates that Harnois has a callous disregard for life. Consequently, we conclude that the sentence of life imprisonment without parole was appropriate and just.

## Conclusion

For the foregoing reasons, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.

Justice FLAHERTY did not participate.