[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION (RELATIVE TO POST TRIAL MOTIONS)
This matter is before the Court post trial, on the motions of plaintiffs for a new trial and motion for defendants for judgment as a matter of law. The trial in this case ensued over 33 trial days from January 5, 2004 through March 3, 2004 in which 21 separate witnesses testified. In the end, the jury returned a verdict in the defendants' favor.
 Facts of the Case
Michael Manning was a 41 year old man, married with four children. On March 4, 1998, he complained of headaches and apparently suffered a significant stroke. He was taken to South County Hospital where he continued treatment under the care of Dr. McNiece, a Doctor of Internal Medicine and Dr. Bellafiore, a Neurologist. On March 9, 1998, Mr. Manning suffered a more massive stroke, was transferred to Massachusetts General Hospital and passed away.
 Standard on Motion for New Trial
The Rhode Island Supreme Court has stated:
 The trial judge should set out some material, factual evidence or absence thereof, direct or circumstantial upon which his or her ruling is based as noted . . . `the trial justice need not analyze all the evidence presented but should [however] state the motivation for his or her ruling.' State v. Vorgvongsa, 670 A.2d 1250, 1252 (R.I. 1996). Citations omitted.
In Parkhurst v. Autieri, 828 A.2d 518, 519 (R.I. 2003) the Supreme Court encouraged the trial justice, when considering a motion for a new trial, to review the facts of the case referring with specificity to enough facts on which to base his or her decision. Accordingly, it is appropriate to review the extensive testimony produced at trial.
On a motion for new trial, the trial justice must "independently weigh, and evaluate the credibility of the trial witnesses and evidence." Wellborn v.Spurwink/Rhode Island, 873 A.2d 884, 887 (R.I. 2005),Graff v. Motta, 748 A.2d 249, 255 (R.I. 2000) (citingMorrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998). "If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds in considering that same evidence could come to different conclusions, the trial justice must allow the verdict to stand."Graff, 748 A.2d at 255. The trial justice should allow the verdict to stand "even though he may entertain some doubt regarding its correctness." Marcotte v. Harrison,443 A.2d 1225, 1232 (R.I. 1982). See also Oliviero v.Jacobson. 846 A.2d 822, 826 (R.I. 2004).
The plaintiffs' first witness was Jill M. Angel, an Emergency Medical Technician, who arrived at the Manning home shortly after Michael collapsed on the morning of March 4, 1998. She determined that his headache was not normal and indicated in her report the need to eliminate the head bleed. Michael was transported to the South County Memorial Hospital Emergency Room.
Plaintiffs then called Dr. Donald McNiece, a Defendant. Dr. McNiece has a general practice with regular privileges at the South County Hospital. He had provided general care for Mr. Manning in the past. He was not the only physician who treated Mr. Manning, but one of the first to treat him at the hospital. He recognized that Michael Manning was entitled to the doctor's "independent medical judgment" during his course of treatment. Dr. McNiece acknowledged that he was the admitting physician, and had a responsibility for the patient in exercising final say over his care and treatment. However, he deferred to Dr. Bellafiore for his expertise and failed to consult with any other Neurologist.
Under questioning as an adverse witness, Dr. McNiece described his function was to establish differential diagnoses and rule out the various possibilities of Mr. Manning's afflictions. One prompt differential diagnosis was that of a stroke, defined as a lack of blood flow to the brain. To treat a stroke the healthcare provider must isolate the blockage. Dr. McNiece needed to rule out an aneurism. Although Dr. McNiece agreed that an angiogram is the "gold standard" for locating a blockage, he added that it was not commonly done as it is so invasive. A Magnetic Resonance Imaging exam ("MRI") was attempted on Mr. Manning on two different occasions. MRIs at South County Hospital were performed at that time in a trailer which was brought to the hospital via the MRI network.
During the first attempt at an MRI on March 4, 1998, Mr. Manning became nauseous, probably because of the confines of the closed machine. Dr. McNiece prescribed Ativan and Compazine. The second scan was not conducted until March 7, 1998, when the MRI trailer was returned to South County Hospital on its normal rounds. Mr. Manning received one milligram of Ativan which did not calm him enough so he could receive the MRI. A second dose of Ativan was given at the trailer which apparently did not calm him sufficiently. Dr. McNiece indicated that he was not at the trailer, and was not sure how much time had passed between doses, or before the MRI was given. It was not until March 7, 1998, that Dr. McNiece learned through a conversation with Dr. Bellafiore that anesthesia could be administered at the MRI site on the trailer.
Dr. McNiece acknowledged that Mr. Manning would need to go to another hospital for treatment if an aneurism or a tumor was found. Dr. McNiece stated that "time is important" and "it is important to get it [testing] done in a timely fashion." Mr. Manning's migraine continued from March 4, 1998 through March 7, 1998. Dr. McNiece testified that he did not track when the MRI machine would actually be at the hospital; he merely prescribed the new MRI. He also failed to monitor the effectiveness of the Ativan, claiming that he depended upon the nurses to monitor the patient's use of Ativan at the MRI site. Dr. McNiece recognized the importance of the MRI, as it would show the blockage or slowed flow of blood. With Dr. Bellafiore on March 5, 1998, they "together" wrote the order for an open MRI. Dr. McNiece did not explain the various options of anesthesia, sedation or angiogram. Dr. McNiece considered the angiogram to be dangerous. He claims he considered Mr. Manning's refusal to take the MRI as a refusal of treatment. Notwithstanding that an established hospital policy requires the recording of refusal of treatment; Dr. McNiece made no such record. Dr. McNiece claims he was unfamiliar with the hospital refusal policy.
Dr. Stephen Payne, an adult family practitioner testified next. Dr. Payne has been an Internist for over 20 years in the Cincinnati area and is Board Certified in internal medicine. In addition to his private practice, he participates in peer review and teaches residents in internal medicine. Dr. Payne testified that Dr. McNiece's treatment was below the standard of care for reasonably competent medical doctors. Dr. Payne concluded that the emergency record suggested sudden neurological problems and Dr. McNiece, as the leader of the team, was responsible to rule out stroke and the other differential diagnoses, enact a treatment plan, and order tests. When the initial plan failed, Dr. McNiece should have enacted a new plan in a timely manner. Dr. Payne concluded that the "patient is still at risk." The plan was to take an MRA[1] and an MRI to provide good imaging of the brain and clot, and that seemed to be a logical plan. Unsuccessful efforts were made on two separate occasions to obtain these images but thereafter nothing was done to rule out the differential diagnosis. There is no documentary evidence that either doctor spoke to the patient or to the family regarding the failed plan. It was Dr. McNiece's responsibility to coordinate the care of Mr. Manning and make sure that he was adequately informed to make life care decisions. Given that it was a sudden neurological event, and it could not be determined what had happened, Dr. Payne concluded that Mr. Manning was "a patient still at risk" as doctors did not know the cause of the "sudden neurological event." Dr. Payne opined that Dr. McNiece's task was to inform the patient of the options and obtain his participation in the plan. According to Dr. Payne, the goal of the plan should be to image the brain tissue and the artery tissue. On March 4 and March 5, 1998, Mr. Manning was still at risk. His wife should have been included in the discussion, and various options should have been discussed and documented. On March 6, 1998, a Transesophageal Angiogram was ordered which required sedation. This test could have been ordered at an earlier period.
Dr. David Gelber was the Mannings' next witness. Dr. Gelber is Board Certified in Neurology, EEG and spinal cord injuries. He taught at the Southern Illinois University of Medicine and participates in peer review. Dr. Gelber explained the myriad types of strokes, various causes of strokes and testified that "good stroke management is to identify the cause of the stroke quickly." He explained that the risk of a second stroke was significant during the year following the initial stroke, and most second strokes occur within the first few weeks of an initial stroke. He concluded that Dr. Bellafiore's conduct fell beneath the standard of care in three separate respects:
 1.) No accurate diagnosis was ever made and indeed the event was never identified as a stroke. The hospital's records reference a migraine, although the migraine symptoms appear to resolve in several hours.
 2.) Dr. Bellafiore violated the standards of care by keeping Mr. Manning at South County Hospital past the second day when no MRI was available. When no MRI was available, Mr. Manning should have been transferred to a facility where imaging was available.
 3.) On March 6, 1998, it was clear that the event which occurred was a stroke given that Mr. Manning began to see a white veil, and other indications indicative of damage to the right brain stem.
Dr. Gelber asserted it was a violation of the standard of care to keep Mr. Manning at South County Hospital as there was no progress toward determining the cause of the stroke. Dr. Gelber testified that the cause of the stroke on March 4, 1998, was a vertebral artery dissection in the left artery. An MRI would have revealed the dissection as the cause of the event. Thereafter, intervention (via an angiogram or administration of urocanase) would be the proper treatment for this diagnosis. Because of the failure to timely diagnose and treat, a piece of tissue separated from the dissection causing the second stroke on March 7, 1998. Well before that, Mr. Manning needed intervention and either an angioplasty or clot buster drug would have prevented further stroke which ultimately occurred on March 9, 1998.
Dr. Gelber emphasized that the risk remained urgent through March 6, 1998. There was no MRI being performed on March 6, 1998, and the doctors recognized that fact. It was Dr. Gelber's expert opinion that, at a minimum, Mr. Manning should have been transferred on March 6, 1998, for further imaging. His condition indicated the need for urgent action on March 6, 1998. Dr. Gelber added that transporting Mr. Manning by ambulance created no additional risk, nor did performing an MRI. There was some additional risk in performing an angiogram but it was "critical to know what's going on" and Mr. Manning's condition "far outweighs the risk of the procedure." Dr. Gelber characterized the first stroke as relatively minor and, if properly treated, Mr. Manning could have returned to his job and lead a productive life.
Dr. McNiece continued his testimony on January 15, 2004, by acknowledging that "I guess I would be responsible ultimately." He indicated that Dr. Bellafiore was a consulting physician and to such "I gave free reign." He was queried on the curious medical order of March 5, 1998, which he acknowledged was written by both himself and Dr. Bellafiore. He testified he left this task to Dr. Bellafiore. Dr. McNiece concluded that it was really Dr. Bellafiore's decision to transfer as he was handling all communications with Rhode Island Hospital for tests. Dr. McNiece depended on Dr. Bellafiore for his knowledge of the clarity of open MRIs and hence the testing.
Dr. McNiece acknowledges that on March 5, 1998, he recorded the need for an MRI but never discussed other alternatives with the patient or members of the Manning family. On March 6 and March 7, 1998, he never discussed alternatives with Mr. Manning or the Manning family. Dr. McNiece claimed that Dr. Bellalfiore had indicated to him that he had held discussions with the Manning family, though Dr. McNiece was unable to find evidence of those discussions in Mr. Manning's hospital records. Dr. McNiece testified that on March 7, 1998, Dr. Bellafiore reported to him he had discussions with the Mannings and as a result, Dr. Bellafiore concluded that the risk of an angiogram was greater than the benefit. Dr. McNiece concurred with Dr. Bellafiore's recommendation. Dr. McNiece dismissed issues of informed consent as the doctor never decided to undertake an angiogram. For him, informed consent would occur only when the doctors decide to perform a treatment or test, at which time they should explain the risks and the benefits so the patient can weigh and decide. There being no decision to perform the test, the doctors were not looking for consent. Dr. McNiece was asked whether Michael Manning refused to be sedated in order to undergo a closed MRI. Dr. McNiece concluded that Mr. Manning never refused to be sedated as this was not discussed as an option.
On examination by defense counsel, Dr. McNiece indicated that he assumed that Dr. Bellafiore was up to date on technology. He met with Dr. Bellafiore regularly and there was no need to record those meetings in the notes. Mr. Manning was significantly oriented and could therefore make decisions. Dr. McNiece was obviously cautious in his testimony but clear, direct and thoughtful in his responses.
Mr. Patrick Muldoon was then called by Plaintiffs. Mr. Muldoon was Chief Executive Officer of South County Hospital for several years commencing in July of 1996. Mr. Muldoon explained the relationship between the hospital and the Rhode Island MRI network. Testing could be performed even if the truck was not at South County Hospital, by transferring patients to the truck. The hospital found the MRI scheduling to be sufficient with few glitches. Mr. Muldoon expected all promulgated hospital policies to be followed, although he did not expect the doctors to know all hospital policies. He testified to the existence of administration policies concerning informed consent and the need to have waivers in writing. (Exhibits 9c and 9e). On cross-examination, Mr. Muldoon was challenged in distinguishing between informed consent requirements for "treatment" as opposed to "testing." It was also unclear how the administrative policies were distributed to physicians at South County Hospital.
Dr. Bellafiore was the next witness called by the Plaintiffs. A Defendant, he was the treating Neurologist for Mr. Manning while at South County Hospital. Though the consulting doctor makes recommendations, Dr. Bellafiore acknowledged that if one is his patient, the patient is his responsibility and the responsibility is more than mere consultation. Dr. Bellafiore's method of recording the treatment progress is most curious. He claimed that he ordered Mr. Manning's first MRI, but could not locate the order in the records. In the end, he claimed that he ordered the test "in essence." He attempted to explain his order of March 4, 1998. He testified that, because no physicians disagreed on his recommendations, it was not clear to him what hospital policy applied concerning the role of an admitting doctor (Dr. McNiece) and his role as a consultant. Dr. Bellafiore acknowledged that some of Mr. Manning's symptoms on his first day at the hospital were consistent with a stroke and he considered stroke a possibility. However, Dr. Bellafiore also concluded that "headaches are not usually a sign of stroke." Dr. Bellafiore then agreed that the headache on the day before his admission was not sudden but came on gradually like Mr. Manning's other headaches.
Dr. Bellafiore agreed that the symptoms Mr. Manning initially had could be consistent with a devastating brain event and recognized that something was going on in the back of the brain, but not necessarily a decreased flow of blood. His goal in treating such a patient is to find the cause of the blood flow interruption. This would isolate the cause of the problem and often keep the stroke from getting worse. He acknowledged that most of Mr. Manning's injuries were not permanent until the second, more devastating event of March 7, 1998, but without knowing the cause of Mr. Manning's initial stroke, he could not easily treat Mr. Manning. Treatment could be provided before knowing the cause, but the more information the more effective that the treatment would be. He indicated that the purpose of ordering an MRI/MRA was to show damage to the brain tissue. An MRA would reveal images of the arteries themselves. A CT scan[2] would not show arterial damage within the first 24 hours, nor would Dr. Bellafiore acknowledge that a CT scan on March 5th would have reflected the result of such damage. No CT scan was performed on March 5 or 6, 1998, although a CT scan was later ordered by phone on March 6, 1998.
Dr. Bellafiore claimed that he performed a full exam on Mr. Manning on March 5, 1998, although he did not make any notations in the medical records. He claimed that it was his routine practice not to make any notations on a physical exam if there were no changes. During evening rounds he would see the patient once again and then make his "daily note for the day." His March 6, 1998, progress note for Mr. Manning indicated that a stroke was likely. He acknowledged that a transesophigial echo could have been performed but based on the symptoms, a shotgun approach was not always the best and he concluded "it wasn't necessary at the time." He acknowledged that the stroke could have been from a broken blood vessel or from the heart.
Dr. Bellafiore acknowledged that the earlier tests are performed, the greater the likelihood of determining the cause. He suggested that the chance that the echo would show the cause was quite small. A laboratory test of the blood could also show extra stickiness in the blood which is another indication of a clot, and ultimately a stroke. This test was not ordered until after the CT scan, although it could have been done earlier. Dr. Bellafiore did not request the test as it takes seven to ten days to come back. By the time the test comes back, Dr. Bellafiore reasoned, the patient was usually out of the hospital. Therefore this test does not help for treatment in the hospital.
On March 7, 1998, two days after the admission, Mr. Manning complained of a loss of visual acuity. Dr. Bellafiore did not find that the worsening of Mr. Manning's "visual field" on March 7, 1998, was significant. The effect is described as a white veil. A CT scan was then ordered to determine if the loss of vision could be caused by a swelling in the brain.
Dr. Gelber returned on January 26, 2004. He discussed medical articles in relation to Mr. Manning's treatment. Dr. Gelber opined that Mr. Manning had a vertebral artery dissection causing the first stroke on March 4, 1998, likely to have resulted from significant lifting which Mr. Manning performed that morning. A 1995 article studied patients who experienced strokes, and TIAs[3] and had blockages in a major blood vessel. For patients promptly treated with blood thinner, additional harm was reduced by 50%. He concluded Heparin is the treatment of choice for anticoagulation and reasoned that Heparin should have been used promptly, according to the standard of care at the time, regardless of where the blockage was. Dr. Gelber concluded that had Heparin been administered, Mr. Manning's second stroke would have been minimized or avoided as there would be time for an angioplasty. A second study demonstrated the effectiveness of balloon angioplasties, particularly as a means to relieve extra-cranial blockages. Using the article and his experience with his own practice as a basis for the opinion, Dr. Gelber concluded that if an angioplasty had been performed after his first extra-cranial blockage, Mr. Manning's chances of stability would be significant. He further concluded that the clot in the vertebral artery broke off on March 7, 1998, causing a more massive stroke, resulting in Mr. Manning's transfer to Massachusetts General Hospital.
On cross-examination, Dr. Gelber agreed that Mr. Manning was becoming less symptomatic after his admission, but he still had headaches and other symptoms. He disputed that aspirin was the treatment of choice recommended by the National Academy of Neurology for Ischemic Stroke. Dr. Gelber found that the efforts of the South County team to get the MRI done were "interesting" but emphasized that the problem was that the MRI was never done. He pointed out that Dr. Bellafiore's notes do not reference stroke until March 6, 1998. Dr. Gelber would not assume that Mr. Manning refused treatment because there was no such notation in the medical records. It is Dr. Gelber's practice to document all treatment and all refusals. A refusal of an MRI or MRA procedure, should be documented given its vital importance. He acknowledged some risk for an angiogram. Dr. Gelber did not criticize Dr. Bellafiore's initial diagnosis and the reasonableness of the emergency room consulting with Dr. Bellafiore in this event. He agreed it was proper for Dr. Bellafiore to see Mr. Manning and to evaluate him each day. He recognized that the doctor who is with the patient is in the best position to access the patient.
On January 27, 2004, Dr. Payne was cross-examined. He acknowledged that Dr. McNiece was present on the first day of Mr. Manning's admission and ensured that a differential diagnosis was already available to him. It was brought out during this cross-examination that Mr. Manning had treatments for his migraine headaches for several years and during the course of his treatment Mr. Manning appeared to be improving. Dr. McNiece knew Dr. Bellafiore had ordered an MRI. On redirect, Dr. Gelber confirmed that the goal of the internal medicine doctor should be to rule out differential diagnosis and to do that, an appropriate imaging would need to be completed. That goal should not have changed and never did change, but was never fulfilled.
Throughout his testimony, Dr. Payne appeared consistent, credible and straightforward. Though prepared, he was able to give a basis for all of his opinions. He attempted to be cooperative with defense counsel even after he suspected that they participated in the loss of a major client of his on the morning of his testimony. (See extensive hearing out of the presence of the jury on January 27, 2004.)
Dr. Putnam was called as a witness commencing on January 29, 2004. Dr. Putnam is a Neuro-interventional Radiologist who treated Mr. Manning when he arrived at Massachusetts General Hospital. He described the stroke team of Massachusetts General Hospital, and his extensive training, and the various procedures employed by the team. He was credible, thorough, highly intelligent, and prepared. He reported that in 1998 Massachusetts General Hospital did not have an open MRI but had a CT scan which took approximately 10 minutes to create an image. Approximately one out of every twenty patients has significant claustrophobia which impairs their ability to be imaged; this is remedied via routine, conscious sedation. Conscious sedation is performed intravenously by administering sedation to calm the patient or place the patient into a near sleep state. The patient is monitored for changes in breathing. If this method is not successful, more significant forms of anesthesia are used. He found the risk from anesthesia or sedation to be generally low for a patient of Mr. Manning's history.
Had he been Mr. Manning's physician at the time, Dr. Putnam would have explained the risks and the benefits of an MRI scan, the risk of conscious sedation and the risk of general anesthesia, if administered. Conscious sedation at Massachusetts General Hospital is generally done by administration of the drug Versed. Most patients who have claustrophobia are calmed via conscious sedation rather than general anesthesia. Dr. Putnam also described the various care levels of hospitals in New England. Massachusetts General Hospital is a tertiary treatment hospital able to handle major problems and patients referred by other hospitals with major medical difficulties. Yale in New Haven is also a tertiary treatment hospital, as is Rhode Island Hospital. Dr. Haas was performing neuroradiation surgery at Rhode Island Hospital in 1998. Neuroradiation treatment was in use in 1998, and included use of a microcatheter to access the clot, and the application of clot buster medication or balloons to improve the flow.
Dr. Putnam then described his treatment of Mr. Manning on March 7, 1998. Upon transfer to Massachusetts General Hospital, Mr. Manning had suffered his second stroke less than six hours earlier, there was a possibility that the microcatheter treatment could be of benefit in opening up the affected arteries. Using a CT scan Dr. Putnam could discern a blood clot in Mr. Manning's basilar artery. At that time, Mr. Manning was awake, could hear and think, but could not move his extremities, implying significant damage to the nerve connections. Inserting dye into the left artery, Dr. Putnam did not see the full flow; he could see that the blockage had broken down so he attempted to travel through the right artery which, in Mr. Manning's case, was somewhat narrow. Dr. Putnam then returned to the left side in order to clear the passage. He then used several balloons attached to microcatheters to attempt to open up the obstruction. The artery was opened via the balloons, but there remained a blockage higher up in Mr. Manning's head. Dr. Putnam used several doses of Heparin to attempt to break the remaining clot and then agreed to refrain from further treatment to see the effect of the clot located near the brain. He described the significant risk of trying to break the clot in such a difficult area.
Dr. Putnam indicated that if the new clot was not removed, Mr. Manning would not survive and hence there was no alternative but to try. When the clot traveled up or reformed in the cerebral artery, he was hoping that the clot-dissolving medication would completely dissolve the clot and did not believe it was appropriate to attempt any other treatment. On further direct examination, Dr. Putnam concluded that the problem in the left vertebral artery was the result of a tear, rather than from a blockage caused by a narrowing of the arteries or arterial sclerosis. It was not important for Dr. Putnam to diagnose the cause of the blockage at the time of the operation, merely to open up the blockage. However, by studying the collaterals for trial (by observing whether or not collateral arteries had formed), Dr. Putnam was able to conclude that there was a tear just above the blockage. Using the image he showed this to the jury. Given his conclusion that the clot was the result of a tear in the basilar artery, Dr. Putnam opined that if Mr. Manning were transferred to a tertiary treatment hospital on March 5, 1998, an angioplasty would have prevented a subsequent stroke, and there would have been minimal risk (5-10%) of the clot continuing to move up through the artery. This angioplasty would have been a highly successful procedure to open the artery without significant risk of complications.
Dr. Putnam concluded to a reasonable degree of medical certainty that the angioplasty would have resulted in a good prognosis for Mr. Manning for several years, though Dr. Putnam candidly admitted that long-term studies are not yet available for this technologically advanced procedure. Dr. Putnam indicated that had Mr. Manning been transferred to Massachusetts General Hospital on March 6, 1998, a complete MRA/MRI scan would have been completed, promptly revealing the blockage. Dr. Putnam would have recommended an angioplasty with a stent or a more invasive operation. These procedures would have prevented the second stroke.
On cross-examination, Dr. Putnam acknowledged that he originally was incorrect about the cause of the stroke being related to Mr. Manning's lifting at work. He explained how the imaging in the exhibits modified his conclusion. Dr. Putnam appeared frank, credible and explained why he was confused earlier. The Court found him to be honest and straightforward. Before leaving Dr. Putnam's testimony, the Court must add how impressive Dr. Putnam's expertise and work is. Dr. Putnam obviously works in a stressful, technologically advanced, specialized profession filled with life and death decisions. He is thorough in his work, capable, and impressive.
Dr. Bellafiore returned to testify on February 2, 2004. He again acknowledged the importance of a prompt evaluation of the cause of the stroke. He claimed he had completed a fundoscopic optical examination and a sensation test on Mr. Manning but failed to document them. He acknowledged he failed to review his chart and the prescriptions are inaccurately documented. He acknowledged that he never tested balance or gait, though these exams may have been informative. At first he explained that his failure to do so was because of Mr. Manning's inability to walk with an intravenous tube ("IV"), but he later recognized that Mr. Manning was mobile. Dr. Bellafiore then questioned whether there was an IV. While he remarked on two occasions how significant Mr. Manning's vision loss was, he acknowledged it was never documented. Dr. Bellafiore admits his failure to discuss the likelihood of an artery tear with Mr. Manning or his wife.
Dr. Bellafiore recognized that South County Hospital did not perform cranial neurosurgery or angioplasty of such arteries in March of 1998, although his differential diagnosis could require such treatments.
Dr. Bellafiore continued his testimony by indicating he had no choice but to complete the MRI on Mr. Manning as an outpatient, as Mr. Manning no longer desired to enter a closed machine. Dr. Bellafiore stressed the importance of the MRI as the only way to determine the cause of the stroke. He described his writing of the note of March 5, 1998, with Dr. McNiece, calling for a prompt MRI. He claimed that Mr. Manning flatly rejected sedation for the MRI, but he never documented the refusal or discussed it with Mrs. Manning. Dr. Bellafiore claimed he did not know the hospital policy requiring documentation for refusals of treatment.
On February 3, 2004, Dr. Daniel Hanley testified for the Mannings as a Board Certified Neurosurgeon. He is a Professor at Johns Hopkins and the University of Maryland. He reviewed Mr. Manning's hospital records and was struck by the early onset of Mr. Manning's vision limitations and neck pain. Dr. Hanley found Dr. Bellafiore's differential diagnoses appropriate, but indicated that they required prompt imaging of the vertebra basilar artery system. The standard of care required the highest degree of imaging available to be completed within 24 hours, given the high probability of mortality which he estimated to be at 50%.
Dr. Hanley summarized that physicians "don't want to leave it in a hypothetical state" so they "want to obtain a gold standard evaluation." As Mr. Manning condition had not improved, it was clear he had a stroke by mid-morning of March 4, 1998. While imaging could be done by the MRA/MRI, a CT scan of the head and neck area, or an angiogram was appropriate alternatives. As no imaging was completed in the first 24 hours after the March 4, 1998 onset, Dr. Hanley concluded that this was a violation of the standard of care. Dr. Hanley further concluded that if such imaging was done, and the blockage could be promptly treated with a blood thinner or possibly with angioplasty. If imaging could not be completed on Mr. Manning, Mr. Manning should have been transferred in order to complete the test.
Dr. Hanley testified that Dr. Bellafiore "chooses the most benign of diagnosis and accepts them without evidence." He referred to March 5, 1998, when there was still no imaging and hence the treatment was continuing, without knowing which vasculature was affected. There was no angiogram. Mr. Manning was still being treated beneath the standard of care. When the Ativan was not sufficient to calm Mr. Manning for the MRI, the physicians needed to discuss the risk existing and chart the risk. Moreover, if Mr. Manning was refusing treatment, the standard of care further required that another family member be brought into the conversation. No other family member was consulted nor was there documentation of the refusal of treatment.
Dr. Hanley's testimony was virtually impenetrable on cross-examination. He was explanatory and logical in his testimony. He was consistent, credible and clear throughout.
Dr. Bellafiore returned to the stand on February 4, 2004. He now discussed the different types of sedatives which are available for an MRI. He stated that he had been confused on this subject at his deposition. Dr. Bellafiore recognized that it was Mr. Manning's choice to undergo imaging. He admitted that he did not discuss his choices with others noting "it's his [Mr. Manning's] decision . . . if he understands the risk." Dr. Bellafiore noted that Mr. Manning never asked the different methods of being sedated.
Dr. Bellafiore recognized he was dealing with a life-threatening risk to Mr. Manning. Yet he failed to document his discussion with Mr. Manning, nor did he discuss Mr. Manning's choices with others. Dr. Bellafiore concluded that because Rhode Island Hospital could not do the imaging[4] he had no choice but to wait. On cross-examination, by Dr. McNiece's counsel on February 5, 2004, Dr. Bellafiore accepted responsibility for the medical care provided declaring "the buck stops here." Contrary to his statements just one day before, he now testified that he did have discussions with Mrs. Manning present but it was the doctor's decision to image via an MRI/MRA. On cross-examination from the hospital's counsel, Dr. Bellafiore indicated that he was not an employee of South County Hospital.
In a very odd colloquy, Dr. Bellafiore attempted to assert how the risk to Mr. Manning would increase over time. Frankly, the Court was challenged in following the doctor's logic. No expert conceded that Mr. Manning was at any less risk from the time he entered South County Hospital.
Timothy Handrigan testified on February 5, 2004, describing Mr. Manning's work and personal life. He noted the significant weight that Mr. Manning was moving on March 3, 1998. Mr. Manning suddenly took ill at work. Though Mr. Handrigan and many other witnesses discussed Mr. Manning's passing and how it affected the family, the Court will not review the testimony concerning damages in an effort to keep this review relatively concise.
On February 10, 2004, Dr. Gelber returned to the stand for cross-examination. He acknowledged that it is the physician's judgment as to when a medical condition should be charted. On re-direct examination, he explained it was obvious that Mr. Manning had suffered a stroke, and was not experiencing a severe migraine as the neurological problems continued for 24 hours.
Kate Manning, a plaintiff and the decedent's widow, then testified. She revealed Mr. Manning's history of migraines and reported that Dr. Bellafiore diagnosed his situation as a complex migraine on March 4, 1998, even though they had explained his lifting at work. She verified that she never received a description of the risk or benefits of the MRI/MRA. Dr. McNiece never revealed the differential diagnosis to Mrs. Manning, but did indicate the desire for an MRI/MRA. She accompanied her husband to the MRI soon after Dr. McNiece left. The MRI was unsuccessful because of Mr. Manning's claustrophobia. The MRI attempt was repeated at six o'clock that night with the Ativan given at the van. On the following day she never heard from Dr. Bellafiore and telephoned the hospital about the possibility of moving her husband to Rhode Island Hospital. She was not able to talk to Dr. Bellafiore until Friday evening, March 6, 1998, so she had notes and various questions to ask him.
Mrs. Manning`s testimony was interrupted by the return of various experts for cross-examination. During cross-examination by Dr. Bellafiore's counsel, Dr. Putnam vividly described the process of going through the various arteries to clear the blockage. Again, he admitted that his first impression of the cause of the blockage was incorrect. On re-direct exam, he verified that the MRI would have clearly shown the occlusion on March 4 or 5 as a dissection, not as a plaque buildup.
Dr. Larson was also an Interventional Radiologist at Massachusetts General Hospital who participated in Mr. Manning's care. Dr. Larson was called by Dr. Bellafiore and did not believe that Mr. Manning had suffered a dissection due to plaque, but had a plaque buildup on his artery. Physicians had to size the risk of transferring Mr. Manning in his tenuous condition. On cross-examination, Dr. Larson described the use of Valium or Ativan for claustrophobia during MRI exams. If the sedative is not effective when given orally, he provides it through an IV.
Dr. Hanley returned for further cross-examination. He revealed that he did not criticize the standard of care provided by Dr. McNiece. On re-direct, he added that the risk to Mr. Manning would be significantly decreased if he were treated prior to his second stroke.
On February 17, 2004, Dr. Gress was called by Dr. Bellafiore's counsel. A Neuroradiologist with training in stroke intervention, he described Interventional Neuroradiation as "a new and rapidly developing field." He acknowledged the risk of a recurrent stroke, but praised Dr. Bellafiore's prompt use of aspirin as a preventative. Dr. Gress generally claimed that Dr. Bellafiore met the standard of care for acute management in a timely fashion. Dr. Gress claimed that the stroke was caused by progressive artery disease and was therefore atherosclerotic. Dr. Gress concluded that apart from a non-contrast CT scan, no further imaging would be required to meet the standard of care in the first 24 hours. He did not refer to an article or to any experience to reach this result. This testimony was strikingly different from all the other doctors who testified, but it was never explained or qualified. No literature was cited, and frankly Dr. Gress did not appear credible on this point. He added that the standard of care was met even though Dr. Bellafiore failed to disclose the significance of Mr. Manning's medical condition to either Mr. Manning or his family. On cross-examination, Dr. Gress acknowledged that Mr. Manning's condition could have been a dissection, and that a dissection was a reasonable consideration. He acknowledged that in the same situation he might have ordered Heparin, and conferred with others to determine whether an MRI was available, and whether sedation was possible. Surprisingly, after repeated cross-examination, he eventually acknowledged that he would have done an angiogram if no other imaging was available.
On February 18, 2004, Mrs. Manning returned to the stand indicating that she believed that her husband was to undergo an open MRI. When she finally spoke to Dr. Bellafiore during the evening of March 6, 1998, he never mentioned the severity of Mr. Manning's condition or that it was life-threatening. She was never asked to speak to Mr. Manning about the need for imaging. Dr. Bellafiore did report that Mr. Manning probably suffered a stroke. As no provider had used the word `stroke' before, she was taken aback. As soon as Dr. Bellafiore left the room, Dr. McNiece came in and provided more details, including various surgery possibilities. Dr. McNiece reported that Mr. Manning's lifestyle would be changed and stressed the need to find the cause of the stroke.
Mrs. Manning testified about the horror of the second stroke on the following day, Saturday morning. She described revealing to two other family members that her husband had suffered a stroke, then being called back to the hospital, hearing of the second stroke, and waiting two hours for the airlift of Mr. Manning to Massachusetts General Hospital. During that wait, Dr. Bellafiore reported to her that Mr. Manning had agreed to undergo an MRI with sedation. Again, she described the horror of her husband's passing.
On February 19, 2004, Dr. Weschler was called by Dr. Bellafiore. He maintained that the cause of the occlusion was plaque buildup. He ascertained this by viewing the collateral arteries and the contrast imaging. With that as his basis, he concluded that imaging on March 4, 1998, would not have helped to improve Mr. Manning's medical condition or broadened the alternatives for treatment. He acknowledged that Mr. Manning needed an MRA/MRI, but did not believe the need was urgent. On cross-examination Dr. Weschler revealed that, although he referenced the contrast imaging films as a basis for his opinion, he never saw the films and was unsure whether the collateral arteries existed. He based his testimony on Dr. Putnam's (earlier) report. Oddly, he indicated that he would not have performed an angioplasty even if the angiogram showed a blockage, because Mr. Manning appeared stable. Dr. Weschler acknowledged the risk of increased clotting. Rarely providing any basis for his opinions (which ran counter to the testimony of other physicians, articles, and logical deduction), his credibility was doubtful.
On February 23, 2004, Dr. McNiece called Dr. Kernan as an expert witness. Reasonable in his direct-examination presentation, Dr. Kernan found Dr. McNiece's treatment met the standard of care because he sought input from the Neurologist. He acknowledged Dr. McNiece was still responsible for Mr. Manning's care but indicated there was no urgent need to transfer for imaging until the second stroke occurred on March 7, 1998. Dr. Kernan acknowledged the need to diagnose and to prevent a second stroke, and that Dr. McNiece had a responsibility to exercise "his own individual medical judgment." Dr. McNiece was proper in assuming that Dr. Bellafiore was conversing with the patient, although such conversation should have been documented. Dr. Kernan could not conclude that the failure to communicate with the Mannings was a violation of the standard of care. On cross-examination, Dr. Kernan refused to follow the questions, and was extremely uncooperative; hence the Court seriously questions his veracity.
Mrs. Manning returned to the stand in between the return of various expert witnesses. She testified that she told Dr. Bellafiore of the continuing visual problems of her husband on March 6, 1998. She was never told the differential diagnosis while Mr. Manning was at South County Hospital. She was not able to speak to any doctor on March 5, 1998, despite her efforts. On March 7, 1998, Dr. Bellafiore indicated that Mr. Manning would survive and recover. She was never told that the MRI machine was down on March 6, 1998.
While Mrs. Manning was nervous at first, she was poised and well-spoken throughout. She was careful with what she said, but having sat through over a month of contentious medical testimony concerning a matter carrying tremendous emotion, her concern was well-founded. Her recollection of events was unwavering and vivid, compared to the other fact witnesses. She was consistent throughout, and unchallenged on cross-examination. The Court found her highly credible.
Dr. Larson returned for his cross-examination on February 26, 2004. He indicated he saw no artery lesions, but when he saw x-ray images displayed at trial, he was unable to reconcile that with what he said during his deposition. Dr. Larson's testimony, that Mr. Manning had an atherosclerotic plaque buildup rather than a dissection, was unconvincing.
On February 27, 2004, Dr. Gress was cross-examined. Resistant to being led, he refused to articulate the national standard of care and was confused as to whether there was a standard of care in the field.[5] He acknowledged treating blockages with Heparin in 1998, though other physicians did not. On re-direct, he generally concluded that Dr. Bellafiore met the standard of care.
On the final day of testimony Dr. Bellafiore was called by his own counsel but did not discuss the facts of Mr. Manning's treatment further, only his own qualifications.
 Motion for New Trial
The Mannings timely filed the instant motion for a new trial to which the defendants objected. In their motion, the Mannings assert that a new trial should be granted because or errors at law and because the jury verdict in favor of the medical providers was clearly against the weight of the credible evidence. Moreover, they contend that the verdict was the result of confusion on the part of the jury. Conversely, the medical providers respond that there were no errors to justify a new trial, and the jury had adequate credible evidence to support its verdict which should not be disturbed.
 The Standard of Review
The motion for new trial comes before the Court pursuant to Superior Court Rule 59 which provides that:
 [A] new trial may be granted to all or any of the parties and on all or part of the issues, (1) an action which there has been a trial by jury for error of law occurring at the trial or for any of the reasons for which the new trials have heretofore been granted in actions at law in the courts of the state.
The standard for review of a motion for new trial is well-settled in Rhode Island. If the court determines that the evidence is evenly balanced or is such that reasonable minds could come to different conclusions, the trial justice must allow the verdict to stand. Graff v.Motta, 748 A.2d 249, 255 (R.I. 2000) even if the trial justice entertained some doubts as to its correctness. Marcotte v. Harrison,443 A.2d 1225, 1232 (R.I. 1982). However, if after making an independent review of the evidence, the trial justice finds "the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy, the verdict must be set aside." Blue Coast, Inc., v. Suarez Corporate Industries,870 A.2d 997, 1008 (R.I. 2005) quoting Connor v. Bjorklund, 833 A.2d 825,827 (R.I. 2003).
 [A] trial justice must undertake at least a 3-step approach in ruling on a motion for new trial. In State v. Salvatore, 763 A.2d 985 (R.I. 2001), we articulated that approach as follows:
 First, the trial justice must consider the evidence in light of the charge to the jury, a charge that is presumably correct and fair to the defendant. Next, the trial justice should form his or her own opinion of the evidence. . . . In so doing, [t]he trial justice must . . . weigh the credibility of the witnesses and [the] other evidence and choose which conflicting testimony and evidence to accept and which to reject. . . . Finally, the trial justice must determine by an individual assessment of the evidence and in light of the charge to the jury, whether the justice would have reached a different result from that of the jury. Id. at 991 (quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994)).
 If, after reviewing the evidence, the trial justice agrees with the verdict, the analysis is complete and the verdict will stand. Banach, 648 A.2d 1367. Blue Coast, Inc., v. Suarez Corporate Industries, 870 A.2d 997, 1008 (R.I. 2005).
Before opining on the strength of the evidence, the Court will first address the alleged errors of law to determine if they justify a new trial.
 Instructions to the Jury
The Mannings allege that the Court committed prejudicial error in its instructions to the jury. Plaintiffs contend that the Court inappropriately instructed the jury by requiring that the Mannings establish that the medical providers failed to exercise judgment in good faith. The original instruction which the Court provided stated:
 The law requires only that a physician base his professional decision on a skillful and careful study and consideration of the case, and when the decision depends on the exercise of judgment, it only requires that he exercise judgment in good faith and in accordance with acceptable medical standards and practice. Physicians are not to be judged by after-acquired knowledge or by the results of later tests.
When the Mannings objected to the instructions, the Court promptly gave a curative instruction which stated:
 The law does not require of a health care professional absolute accuracy, nor does it require of him the utmost degree of skill and learning known only to a few in his profession, but only to that degree of knowledge and skill commonly possessed by members of his profession in his specialty, similarly situated and in such a situation as that shown here. The test of the liability of a doctor for malpractice is not whether the care of Mr. Manning was the doctor's best judgment or whether that judgment was mistaken, but rather the test is whether that care met the legal standard of care as I defined it for you.
This curative instruction [from plaintiffs] was in accord with Parrella v. Bowling, 796 A.2d 1091 (R.I. 2002).
While the Mannings claim that the Court required a showing of good faith in the initial instruction, the instruction, which was actually given by the Court, required a deviation from the standard of care. If any requirement was made concerning the good faith of the doctor, it was in addition to showing the deviation from the standard of care. The word "and" was used. The original instruction, when read in its entirety, does not mandate a showing of bad faith by the physician. The original instruction required a showing of bad faith only in instances when judgment needs to be exercised.See DeFranco.
More significantly, if any error was committed, it was completely corrected by the curative instruction, referenced above. The later instruction clarifies that the finders of fact need not consider the good faith or judgment of the physician. It resolves any misstatement or ambiguity and clearly distinguishes the elements which the jury must find. A curative instruction, immediately upon realization of the error, mitigates the original error, and may render the erroneous instruction harmless. See Kurczy v. St. Joseph VeteransAssociation, Inc., 820 A.2d 929, 944 (R.I. 2003).
The Mannings also allege that the Court erroneously instructed on comparative negligence, by shifting the burden of proof. The instruction did not impose an additional burden of proof on the plaintiffs, it simply stated that if the Mannings established they exercised due care, the jury need not reach the comparative negligence issue. The instruction concerning the burden of proof clarified which party carried the burden. Prior to any testimony at the start of the trial and at the conclusion of the trial, the court instructed "The law places upon each party the obligation of proving that which it asserts or claims; in other words, he who advances a proposition has the burden of sustaining its validity."
Most significantly, instructions should be considered in their entirety. Kurczy at 944. The entire instruction relative to contributory negligence and comparative negligence began with the phrase "if you reach a point where you have found that any of the defendants was negligent . . ." When the jury returned the verdict, it never found the defendants to be negligent at all. The verdict form establishes that the jury never found any liability for negligence on the part of any of the three defendants.[6] The jury never even reached the secondary questions concerning proximate cause. Hence, the issue of the Mannings' own negligence was never reached. As plaintiffs cannot demonstrate that the jury was misled to prejudice the Mannings, hence, the instruction (even if erroneous) is of no consequence.Kurczy at 944.
 Verdict Form
The Mannings contend that the verdict form only compounds the Court's error relative to the instruction on comparative negligence. The Court requested proposed verdict forms during pretrial conferences and at the outset of the trial. It was no surprise when the defendants alleged that the Mannings shared some liability. Nevertheless, plaintiffs did not submit a proposed verdict form until March 3, 2004 (literally hours before the jury was excused to deliberate).[7]
Question seven of the verdict form asked the jury to "apportion the percentage of negligence for each party found negligent." This direction is preceded by the following sentence "If you answer YES to any of Questions 2, 4, OR 6, then complete the following." Clearly, the jury did not need to answer this question unless it found some negligence on the part of Dr. Bellafiore (Questions 1 and 2), Dr. McNiece (Question 3 and 4), or South County Hospital (Questions 5 and 6). The verdict form establishes that the jury did not find negligence on the part of Dr. Bellafiore, Dr. McNiece or South County Hospital, and hence, it never answered, nor was obligated to answer, interrogatory question 7. There was no confusion on the part of the jury as to these issues of law.
Moreover, the Mannings do not allege that the verdict form incorrectly shifts the burden of proof, they simply state that the verdict form does not clearly express a burden of proof.[8]
 Limiting the Testimony of Mr. Muldoon
The Mannings called Patrick Muldoon, a former Administrator of South County Hospital, to testify. He testified that the hospital had established and published refusal of treatment policies, available throughout the hospital. The Mannings now allege that the Court improperly precluded Mr. Muldoon from testifying "regarding the obligations of the physicians to comply with the hospital's patient-refusal-of-testing policies." Memorandum of Plaintiffs, April 6, 2004, page 3.
Mr. Muldoon was not a physician. As such, he was unable to speak to the standard of care which should be followed by the physicians. At the time of Mr. Muldoon's testimony, insufficient foundation evidence had been introduced, that is, no physician had established that the policies must be followed. Compounding this obstacle was the failure of the plaintiffs to establish that the policies were distributed to the physicians. The policies were written, and offered as exhibits. Mr. Muldoon's knowledge of the policies was never at issue. Yet, the question of whether the physicians knew (or should have known or could have known) these policies was never resolved. Moreover, both of the individual physicians were not hospital employees, but independent contractors. Mr. Muldoon's testimony was properly limited.
 Inadequate Discovery Disclosure
The Mannings contend that the failure of Dr. Bellafiore to fully respond to discovery requests prevented a fair trial. At trial, Dr. Bellafiore testified that he suggested other sedation alternatives to Mr. Manning. Further, Dr. Bellafiore went on to testify that Mr. Manning refused treatment in conversations with Dr. Bellafiore. This had not been disclosed in detailed interrogatory answers or extensive depositions of Dr. Bellafiore. At trial, Dr. Bellafiore attempted to blame his attorney for his failure to reveal Mr. Manning's alleged refusal.[9]
Obviously, discovery abuses are a challenge to the trial court. In the midst of a lengthy, hotly contested medical malpractice case, the failure to disclose such an important defense was not only critical, it left the court in the midst of a dilemma for which there was no just resolution (not to mention the disarray to the extensively prepared plaintiffs' case). At trial, the Court suspected that the credibility of Dr. Bellafiore would be significantly lessened when such an obvious, pivotal fact was not disclosed in sworn answers. Apparently, the jury did not recognize the gravity of this flagrant discovery abuse. In hindsight, the injustice was never cured. The Court only precluded the fact finder in its quest for the truth, when its proper role was to accommodate the fact finder within the confines of the rules and fairness.
If Dr. Bellafiore's trial testimony was accurate, he disclosed Mr. Manning's refusal of treatment to his attorney during discovery. Cautious about venturing into privileged conversations, the Court steered plaintiffs' counsel from inquiring further.[10] After years of preparation, cross-country travel for depositions, and paying ghastly fees to experts, plaintiffs were left with everything they attempted to avoid: trial by surprise where the Mannings were left to proceed by the seats of their pants.
This flagrant abuse, in itself, justifies extensive relief, see Insurance Company of North America v.Kayser-Roth, 770 A.2d 403, 412 (R.I. 2001), including a new trial against Dr. Bellafiore. The Mannings have requested entry of a default judgment against Dr. Bellafiore. Frankly, there is no easy, just solution. A default prevents a full trial by jury, and Dr. Bellafiore would likely be entitled to a jury trial on the issue of damages. A new trial requires even more testimony and expense. Accordingly, the trial court leaves open the question of sanctions — specifically whether the Mannings should be compensated for expert fees, legal fees and other sanctions, for trying this case twice. Motions and memoranda on this issue shall be submitted within fifteen days of the date of this Order, and the adverse parties shall have seven days to respond. These motions shall be considered by Mr. Justice Lanphear.
 Evidence Presented to Jury
The parties in this matter presented distinct theories of the case. The Manning family asserts that the evidence, including the testimony of the defendants, established that the standard of care for a reasonably competent physician of Internal Medicine or Neurology in March of 1998 required prompt medical imaging of Mr. Manning within 24 hours of the initial onset of his stroke. The Mannings further suggest that the standard of care required Heparin to be administered as a blood thinner. The Mannings contend that the defendants failed to meet the standards of care by failing to image promptly, or administer Heparin, and their failure to do so prevented the health care providers from fully diagnosing the stroke. This, in turn, mitigated future treatment such as an angioplasty. The Mannings claim the administration of Heparin would have prevented additional complications. As a result of their failure to act timely, the Mannings argue that Mr. Manning's clot moved further along the artery into the brain, resulting in a second stroke considerably limiting Mr. Manning's remaining life functions. The Mannings further contend that Mr. Manning was not apprised of the alternatives available for imaging (such as conscious sedation or travel to another facility in southern New England) or the risks involved.
Regarding the issue of negligence, the Rhode Island Supreme Court has declared "a physician is under a duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class in which he or she belongs, acting in the same or similar circumstances." Sheeley v. Memorial Hospital, 710 A.2d 161,167 (R.I. 1998). Hence, "the focus in any medical malpractice case should be the procedure performed and the question of whether it was executed in conformity with the recognized standard of care, the primary concern being whether the treatment was administered in a reasonable manner. Id at 166.
The standard of care for physicians specializing in Neurology was established by the Mannings through the testimony of Doctors Gelber, Putnam and Hanley. Dr. Gelber established that "good stroke management is to identify the cause of the stroke quickly." He emphasized the risk of a second stroke, most likely in the first few weeks, and found that the risk became urgent on March 6, 1998. Dr. Gelber established that it was critical to know what was going on and that "far outweighs the risk of the procedure." He found that Dr. Bellafiore fell below this standard of care by (1) never making an accurate diagnosis (never identifying it as a stroke); (2) keeping Mr. Manning at South County Hospital through the second day when no MRI was available and (3) not moving promptly to diagnosis the cause of the stroke even after the white veil appeared on March 6, 1998. He concluded the white veil was an obvious indication of damage.
As the cause of the stroke was a dissection of the vertebral artery, an MRI would have shown the problem. Dr. Gelber also urged the use of Heparin, as the standard of care was to anticoagulate, and hence, aspirin was not a sufficient substitute. If an MRI was not given, a prompt angioplasty would have increased the chances of Mr. Manning's stability.
Dr. Putnam, a Neuro-interventional Radiologist, confirmed that a transfer to a tertiary hospital on March 5, 1998, or an angioplasty, would have prevented the second stroke. Dr. Putnam found Mr. Manning's blockage was from a tear in his left ventricular artery. He stated that if Mr. Manning was transferred earlier, he would have received prompt imaging, which would have shown this dissection. An angioplasty would then increase the blood flow. Angioplasties have proved to be "highly successful" in increasing blood flow and preventing subsequent strokes.
Dr. Hanley was both a Neurologist and Neurosurgeon. He confirmed that Dr. Bellafiore deviated from the standard of care without imaging the patient within 24 hours. In his opinion, Mr. Manning needed an MRA/MRI or a CT scan or an angiogram, all of which would be available at a tertiary hospital. The standard of care required that Mr. Manning be transferred to a tertiary hospital on March 4, 1998, as South County could not complete the imaging earlier. As the standard would be to provide an angiogram as soon as possible, Dr. Hanley concluded that Dr. Bellafiore departed from the standard. Dr. Hanley testified Dr. Bellafiore "chooses the most benign of diagnoses and accepts them on no evidence." In this case, he referenced the situation as the "clock ticking" where "you don't get second and third chances . . . [this was an] absolute high priority emergency." He confirmed that the inclusion would have shown on the image, if the standard of care was met.
Dr. Hanley also confirmed that the standard of care was to discuss the risks and benefits to the patient, and to document the disclosure and the competence of the patient. The standard of care required discussion with the wife, given Mr. Manning's situation. Dr. Hanley confirmed that if Mr. Manning was properly treated he would likely survive through the age of 65.
Dr. Bellafiore's own testimony further and best supports the proposition that he failed to meet the standard of care. He acknowledged that Mr. Manning had signs of stroke on the first day he was in the hospital. He agreed that prompt determination of the cause of the problem may have kept his stroke from getting worse. Dr. Bellafiore testified that he did not record all of the tests, or his exam findings even though such notations would have assisted other medical providers. He acknowledged that South County Hospital did not have angioplasties available to it and did not perform angioplasties in 1998.
In surprise testimony, Dr. Bellafiore claimed that Mr. Manning refused the MRI, but Dr. Bellafiore never documented this. Dr. Bellafiore admitted he did not discuss the situation with Mr. Manning's family, but when Dr. Bellafiore took the stand the next day, he indicated that he did have discussions with Mrs. Manning present.
After reviewing all the expert testimony offered by the parties in support of their positions, this Court finds that Dr. Bellafiore's own testimony supports the theory that he failed to meet the standard of care. Dr. Bellafiore indicated that he knew the standard of care was prompt imaging and identifying the cause of the stroke. Dr. Bellafiore's theory of the case is that other potential diagnoses needed to be ruled out, as Mr. Manning presented with headaches. He acknowledges failing to rule out the other diagnoses during three days of treatment. Dr. Bellafiore claims that Mr. Manning's inability to complete the MRI constitutes a refusal of treatment. At best, it constitutes the refusal of an MRI, not a CT scan or angiogram. Compounded by testimony which contradicted not only his own testimony, but that of fact witnesses and expert witnesses, the jury was significantly challenged in adopting Dr. Bellafiore's interpretations of the facts. Oddly, Dr. Bellafiore contends his "obsessiveness" compels him to insure that an MRI was done as it was "my mission to get him into an MRI." His mission to determine the cause of the stroke was simply never fulfilled.
It is clear to this trial justice that the jury's verdict (for Dr. Bellafiore on the claim of negligence) is against the fair preponderance of the evidence, consisting of the expert testimony provided in court, the written materials submitted as exhibits, the testimony of the witnesses concerning the factual events, and the reasonable inferences drawn therefrom. The jury was confronted with substantial information which established that the standard of care for treatment of a potential stroke patient required prompt imaging. The plaintiffs established that prompt imaging did not occur. Dr. Bellafiore acknowledged that such imaging was required.
The Mannings did not press a motion for a new trial based on the weight of the facts relative to the issue of informed consent. As indicated above, substantial lapses in Dr. Bellafiore's discovery responses prevented the Mannings from obtaining a fair trial on the issue of informed consent.
In sum, the verdicts relative to Dr. Bellafiore fail "to do justice or respond to the merits of the controversy." Bajakian v. Erinakes, 880 A2d 843, 851 (R.I. 2005), quoting Ruggieri v. Big G Supermarkets,Inc., 114 R.I. 211, 216, 330 A.2d 810, 812 (1975).
The standard of care for physicians specializing in Internal Medicine was established by the Mannings with the testimony of Dr. Payne, an Internist. Dr. Payne testified that the standard of care for physicians of internal medicine required the prompt identification of the cause of Mr. Manning's affliction, by ruling out different alternatives of the differential diagnosis. Dr. Payne indicated that the goal of ruling out the different causes was never fulfilled, nor was it ever changed. He claims that Dr. McNiece further claimed to meet the standard of care by failing to meet with the patient or the wife directly, particularly after the plan "to perform an MRI" failed and the patient was still at risk. Dr. McNiece admitted responsibility for the patient but acknowledged that he deferred in part to Dr. Bellafiore. Paired with Dr. Bellafiore's representations to Dr. McNiece that he had already spoken to the family and discussed Mr. Manning's options, Dr. McNiece may have been justified in relying upon his fellow practitioner.
Dr. Bellafiore represented "the buck stops here." In the medical world, this does not absolve Dr. McNiece of any obligation to tend to the patient's needs; however, it verifies that Dr. McNiece relied on Dr. Bellafiore's representations and findings. Given Dr. Bellafiore's specialization, Dr. McNiece adopted his findings that the risk of an angiogram would be better than the benefit of the angiogram. Dr. McNiece attempted to communicate and keep up to date on the status of Mr. Manning. Dr. McNiece frankly recognized throughout that it was important to get the testing done within a timely fashion, that he was obligated to exercise his "independent medical judgment," and that an MRI is the "gold standard" for testing. But he indicated further that he gave Dr. Bellafiore "free reign."
The Court cannot conclude that the jury's verdict relative to Dr. McNiece is unsupported by the fair preponderance of the evidence. The jury was confronted with conflicting information concerning Dr. McNiece's liability. The jury determined that Dr. McNiece was not negligent. The jury was reasonable based on the substantial testimony — including that of Dr. Bellafiore — offered at trial. Weighing the evidence and examining the credibility of evidence, this Court finds that the verdict relative to Dr. McNiece responds to the merits of the case and is not against the fair preponderance of the evidence. There was sufficient evidence to support the jury verdict for Dr. McNiece.
 Hospital Liability
There was little, if any, evidence of actual negligence on the part of the hospital. Dr. Bellafiore and Dr. McNiece each established that they were independent contractors of the hospital. The Mannings did little to dispute the physicians' contractual relationships. Generally, one who enlists an independent contractor is not vicariously liable for the torts committed by the contractor during the course of the work, Webbier v. Thoroughbred Racing Protective Bureau,Inc., 105 R.I. 605, 254 A.2d 285 (1969).
The liability of South County Hospital is premised upon Dr. Bellafiore and Dr. McNiece being agents of the hospital, in some capacity. There is no outward, obvious act, or express agency agreement, to establish an agency agreement. In fact, the Mannings had independent relationships with Dr. McNiece as their family physician, prior to the hospital treatment.
A recent decision discusses the apparent authority of hospitals over independently contracted physicians. This analysis was rendered in a summary judgment context by Justice Thunberg, a highly respected member of this Court, Sadly, that case also involved a patient at South County Hospital who had passed away.
 In Rhode Island the doctrine of apparent agency was intended to provide recourse to third parties who justifiably contract under the belief that another is an agent of a principal and detrimentally suffer as a result of that reliance. Butler v. McDonald's Corp., 110 F.Supp.2d 62, 68 (D.R.I. 2000) (citing Calenda v. Allstate Ins. Co., 518 A.2d 624, 628 (R.I. 1986); Petrone v. Davis, 118 R.I. 261, 373 A.2d 485, 487
(R.I. 1977)). "The doctrine of apparent agency exists in order to allow third parties to depend on agents without investigating their agency before every single transaction." Schock v. United States., 56 F.Supp.2d 185, 193 (D.R.I. 1999) (citing Menard Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys. Inc., 539 A.2d 523, 526 (R.I. 1988)).
 The R.I. Supreme Court extended the doctrine of apparent authority to medical malpractice actions in Rodrigues v. Miriam Hosp., 623 A.2d 456, 462 (R.I. 1993). The Court recited Agency § 267 and stated "[v]iewing the restatement in conjunction with prior Rhode Island case law, we believe that an individual must satisfy the following three criteria in order to sustain a medical-malpractice action against a hospital based on apparent authority. The patient must establish (1) that the hospital, or its agents, acted in a manner that would lead a reasonable person to conclude that the physician was an employee or agent of the hospital, (2) that the patient actually believed the physician was an agent or a servant of the hospital, and (3) that the patient thereby relied to his detriment upon the care and skill of the allegedly negligent physician." Rodrigues v. Miriam Hosp., 623 A.2d 456, 462; see also George v. Fadiani, 772 A.2d 1065, 1069 (R.I. 2001); Butler v. McDonald's Corp., 110 F.Supp.2d 62, 68 (D.R.I. 2000).
 Such a determination necessarily involves a fact-intensive inquiry. "Crucial to any such determination is the manner in which the medical professionals conduct themselves or hold themselves out." Fadiani, 772 A.2d at 1069. Against this backdrop of controlling case law, we revisit the facts offered by the Plaintiff. Plaintiff points to the fact that the CT scan was ordered on a South County Hospital form. The CT scan was performed in South County Hospital with a Hospital owned scanner. The CT scan was entitled a South County Hospital report. The name "X-Ray Associates" did not appear anywhere in the Hospital in 2003, and there is no evidence that the name appeared anywhere in the Hospital in 1998.
 South County Hospital avers that in the present case, as Ms. Zinsser is deceased, it is impossible for the Plaintiff to prove the decedent's actual belief and her reliance on that belief. This Court refuses to adopt such a harsh application of the test for apparent authority. As another court has noted, a strict application of the reliance requirement is inappropriate in the hospital context because in some cases, the patient might be so severely impaired as to be incapable of communicating or may not survive the negligent acts of an independent contracting physician. In those cases it would be nearly impossible to prove that the patient actually relied on the hospital's holding the physician out as an employee of the hospital. It would be incongruous to allow a patient who survives a negligent encounter relatively intact to recover because she or he is able to testify whether she or he actually relied, but not allow a severely impaired or deceased patient to recover because she or he is unable to recount what her or his actual belief was. Jennison v. Providence St. Vincent Medical Center, 25 P.3d 358, 367 (Or.App. 2001).
 Furthermore, this Court notes that it is reasonable to assume that a person in Ms. Zinsser's position would not have known that a radiologist, a physician she never met nor had any knowledge of, would be anything other than an employee of hospital. "The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. . . . Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." Clark v. Southview Hospital Family Health Center, 68 Ohio St.3d 435, 628 N.E.2d 46, 53 (1994).
 It seems readily apparent that there remain issues of fact regarding apparent authority. Even though the decedent was found unconscious and had no say in being transported to the South County Hospital Emergency Room or in choosing her initial doctor, she did remain at South County Hospital for three days — indicating possible reliance on the Hospital and "its" physicians. The Plaintiff points out several facts regarding the relationship between the Hospital and X-Ray Associates that could lead a reasonable person to conclude that the radiology services were performed by an agent of employee of the hospital. Additionally, although there is no direct evidence from the decedent as to what she believed and relied on, the Plaintiff should be allowed to submit circumstantial evidence (conversations with her husband, other doctors, etc.) as to this point, otherwise, as the Plaintiff points out, an incongruous situation would be created whereby a dead or incapacitated Plaintiff could never prove apparent authority.
 This Court is not finding that Plaintiff presented conclusive evidence as to the issue of apparent authority. A jury may ultimately reject this contention, but such a determination is one for the fact finder.
 Sheldon v. Damle, 2004 WL 2075138, excerpt from pages 2004 WL 2075138 *2-2004 WL 2075138 *4. (R.I.Super. 2004), footnotes omitted.
The instant case comes in a different context. Mr. Manning was conscious during his transport and initial treatment at the hospital, but did not survive to testify. But for Dr. Bellafiore's alleged introduction as the Neurologist for the hospital on the first day, and the physicians' mere presence at the community hospital, there is little to link them. Even if the Mannings were "looking to the hospital to provide such care," there was enough for a jury to find no agency relationships. Accordingly, the Court concludes, after trial, that the jury had sufficient bases to conclude that the hospital was not negligent, and the physicians were not its agents.
 Judgment as a Matter of Law
In addition to the Mannings' motion for a new trial, defendants have also moved for judgment as a matter of law. The motions of the three defendants were reserved until after the verdict.
The motions of South County Hospital and Dr. McNiece to dismiss the complaint for judgment as a matter of law are now moot as the jury found in their favor and the motion for a new trial against them fails.
Dr. Bellafiore also moved for judgment as a matter of law pursuant to Rule 50. The Court previously denied Dr. Bellafiore's motion on the informed consent and battery claims. To the extent that such motion has been renewed, the Court notes that Dr. Bellafiore's inadequate discovery disclosures relate to each of the remaining counts. As the Court must consider such evidence in a light most favorable to the nonmoving party, Bajakian v. Erinakes, 880 A.2.2d 843, 849 (R.I. 2005), Dr. Bellafiore's motion is denied.
The Mannings renewed their motion for judgment as a matter of law at the conclusion of the trial, and the Court reserved upon that motion until after the verdict. As the verdict found in favor of Dr. Bellafiore, the Mannings focused principally on its motion for a new trial. However, the Court's rulings on the motion for a new trial relative to Dr. Bellafiore, and for relief for Dr. Bellafiore's inadequate discovery disclosures have already been addressed herein.
 Conclusion
In this Court's opinion, the verdict in favor of Dr. McNiece was appropriate. Credible testimony and evidence was presented by both sides. Reasonable minds could have differed, and could have come to the conclusion reached by the jury. The Court cannot find that the verdict fails to respond to the evidence presented. The Mannings' motion for a new trial against Dr. McNiece is denied.
In this Court's opinion, the verdict in favor of Dr. Bellafiore is not based on ample credible testimony and evidence. For the foregoing reasons, this Court finds that the verdict fails to respond to the evidence. Reasonable minds could not have come to the conclusion reached by the jury. Accordingly, the Mannings motion for new trial against Dr. Bellafiore on the issues of negligence and informed consent must be and is granted. The Court leaves open the issue of sanctions against Dr. Bellafiore for discovery abuses as described herein. The Mannings' motion for new trial against Dr. Bellafiore is granted.
In this Court's opinion, the verdict in favor of South County Hospital is reasonable and appropriate, based on the evidence presented at trial. In light of the evidence presented, it is a logical verdict which responds to the evidence presented. The Mannings' motion for new trial against South County Hospital is denied.
Dr. Bellafiore's motion for judgment as a matter of law is denied and all other motions for judgment as a matter of law are moot. The Court leaves open the issue of sanctions against Dr. Bellafiore and counsel as described herein.
Counsel for the plaintiff shall submit the appropriate order for entry.
[1] Magnetic resonance angiography.
[2] A CT scan is computerized tomography, or x-ray images of cross-sections of the body.
[3] Transient ischemic attack.
[4] Allegedly, the open MRI at Rhode Island Hospital was inoperative on March 5, 1998.
[5] The testimony expert witness in a medical malpractice case which does not recognize a standard of care is of little probative value.
[6] While the Mannings allege now that the verdict form compounds the error, the only objection to the verdict form expressed at trial was focused on the joint tortfeasor issues.
[7] This trial ensued for weeks. Throughout the trial and at numerous conferences the Court welcomed proposals for instructions and verdict forms. The Court drafted approximately five sets of jury interrogatories. These were discussed in conferences. Indeed, the verdict form is marked "3/3B" denoting the third version of the Court's drafts of March 3, 2004. Others were prepared by the Court on the previous days.
[8] The actual verdict form completed by the jurors indicated that they failed to find negligence (questions 1, 3, and 5) and they failed to find that plaintiff had established a lack of informed consent (questions 9-10). As the jury never answered the question concerning damages, it is obvious that it found a complete lack of liability, regardless of the damage interrogatories contained on the verdict sheet. The issue of apportionment of liability on the verdict form came after the questions of liability. The jury never answered the interrogatories asking it to apportion the negligence among the parties or to establish the amount of the damages.
[9] By means of illustration, reference is made to Defendant Bellafiore's Pretrial Memorandum of December 30, 2003, pages 2-4 which describe the physician's course of treatment, but never a hint of a refusal of treatment. This is a significant omission.
[10] Given the timing of the disclosure, the obvious failure to disclose during discovery and the importance of the issue at trial, it is reasonable to infer that the failure to disclose was deliberate.